Diego J. HERBSTEIN, Plaintiff,

v.

Martin E. BRUETMAN, High Tech Medical Parks Development Corp., Ronald Tash, Douglas Kiell, Mauricio Agudelo, and Alta Technologia Medica, S.A., Defendants.

No. 89 Civ. 6864 (RWS).

United States District Court, S.D. New York.

June 18, 1992.

Carro, Spanbock, Kaster & Cuiffo (Ronald E. DePetris, Seth F. Kaufman, of counsel), New York City, for plaintiff.

Bell & McGurk, Ltd. by James A. McGurk, Dennis A. Bell, Chicago, Ill., Baer Marks & Upham, of counsel by Barry J. Mandel, Peter E. Cooper, New York City, for defendants Martin E. Bruetman, High Tech Medical Parks Dev. Corp., Douglas Keill, Mauricio Agudelo and Alta Tecnologia Medica S.A.

Ronald A. Tash, pro se.

## OPINION

SWEET, District Judge.

Defendants Martin E. Bruetman ("Bruetman"), Douglas Keill ("Keill"), Mauricio Agudelo ("Agudelo"), High Tech Medical Parks Development Corp. ("High Tech"), and Alta Tecnologia Medica, S.A. ("Alta–2"), have moved jointly for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Agudelo, Keill, and *pro se* Defendant Ronald Tash ("Tash") have separately moved for summary judgment. Bruetman, Keill, Agudelo, High Tech, and Alta–2 have also filed a separate motion for summary judgment based on a proceeding in Argentina (the "Collateral Estoppel Motion"). Finally, Plaintiff Diego J. Herbstein ("Herbstein") has moved for the entry of a default judgment against the Defendants pursuant to Rule 37 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motions are denied.

*Parties*

Herbstein is a citizen of Argentina who currently is a permanent United States resident domiciled in the State of New York. He is an officer, director, and 50% shareholder in Imagenes Por Computacion ("IxC"), and is listed as a director and 8% shareholder of Altec–2.

Bruetman is a citizen and a resident of Illinois. He is president, chief executive officer, and chairman of the board of IxC, and is a member of the board of directors of Altec–2. Bruetman also is the majority shareholder in High Tech.

High Tech is an Illinois corporation with its principal place of business in Illinois. It specializes in the scientific and technical advising of medical establishments. High Tech owns 49% of Altec–2 stock.

Tash is a citizen of Illinois and is a 12.-25% shareholder in High Tech. He serves as secretary and legal counsel for High Tech.

Keill was a citizen of Connecticut and, at all relevant times, owned 12.25% of High Tech stock. Until January 1989, he was the president, chief financial officer, and a director of High Tech. He presently is a citizen of North Carolina.

Agudelo was a citizen of Illinois and the controller of High Tech. He resigned from

High Tech on May 31, 1991, and presently is a citizen of North Carolina.

Altec–2 is an Argentine corporation with its headquarters in Buenos Aires, Argentina. It is engaged in the development of diagnostic centers in Argentina and other South American countries.

*Prior Proceedings*

In 1989, Herbstein initiated a suit in Argentina against Bruetman and Amerigo Pescio. At approximately the same time, Bruetman initiated a suit on behalf of himself and IxC, requesting an investigation of "accounting irregularities" at IxC. These proceedings are generally discussed in this Court's opinion of July 11, 1990, familiarity with which is presumed. *See* 743 F.Supp. 184, 186–87 (S.D.N.Y.1990) ("*Herbstein I*"). Both Herbstein and Bruetman sought to have themselves declared "victims" of the alleged fraud in the resulting action. Their requests were denied, and IxC declared to be the victim of the alleged fraud being investigated. On October 10, 1990, the Honorable Emilio Garcia–Mendez issued an order temporarily dismissing the action awaiting further evidence.

On October 16, 1989, Herbstein filed his Complaint in this action. In it, he seeks damages for the Defendants' alleged fraud, racketeering, conversion, and breach of fiduciary duty.

On January 17, 1990, the Bruetman Defendants filed a motion to dismiss this action on the grounds of comity or *forum non conveniens*, or alternatively, to stay it until the resolution of the proceedings in Argentina. The motion was denied. *See id.* at 190.

On January 10, 1991, Altec–2 moved to dismiss the complaint against it for lack of personal jurisdiction. Its motion was denied in an opinion dated June 28, 1991. *See* 768 F.Supp. 79, 82 (S.D.N.Y.1991).

In July 1991, Herbstein moved for Rule 11 sanctions against Bruetman for having allegedly submitted a fraudulent affidavit in support of the *forum non conveniens* motion. On October 3, 1991, the motion was denied with leave granted to renew, and a request for an order granting Herb-stein discovery of the current net worth of certain of the Defendants was granted.

The Defendants filed a motion for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure on October 3. It was disposed of in open court on October 8, 1991.

In February 1992, a default judgment for $18,000,000 against certain of the Defendants was entered in the United States District Court for the Northern District of Illinois. *See Philips Medical Systems International v. Bruetman*, 91 C 4385 (N.D.Ill. Feb. 1992) (the "Chicago Action"). This judgment was entered in part due to Bruetman's failure to comply with that court's discovery orders. It currently is on appeal to the United States Court of Appeals for the Seventh Circuit.

In a letter dated February 27, 1992, Herbstein requested, among other things, that the Defendants be ordered to comply fully with the October 3 discovery order. The letter was treated as a motion and heard on March 4, 1992. The motion was granted and an order entered March 10, 1992, directing the Defendants to comply by March 14.

The Defendants filed the first four summary judgment motions on February 21, 1992. To protect Herbstein's interests in light of the Illinois judgment before he expended any effort in responding to the Defendants' motions, the Defendants were ordered on March 13, 1992, to post a $75,000 security bond. *See* 141 F.R.D. 246 (S.D.N.Y.1992). They complied by paying $75,000 into the Court on March 25, 1992. In the meantime, the Defendants filed the Collateral Estoppel motion on March 23.

Herbstein sought entry of a default judgment based on the Defendants' alleged failure to comply with the March 10, 1992, discovery order by a letter dated March 26, 1992. Oral argument on all six motions was consolidated and heard on April 1, 1992. Additional submissions were received through April 8, 1992, and the motions considered submitted as of that date.

## Facts[1]

Bruetman solicited Herbstein in late 1986 to early 1987 with a proposal to invest in a sophisticated medical diagnostic center in Buenos Aries, Argentina. Once operating, the diagnostic center was to have provided diagnostic services to the Guemes Hospital in Buenos Aries ("Guemes"). The parties met in New York to discuss the details of the proposal and negotiated with each other by both mail and telephone.

In April 1987, Herbstein began sending payments to Bruetman to begin establishing the proposed company. The company, Alta Tecnologia S.A. ("Altec–1"), was incorporated by June 1987 in Argentina. Herbstein and Bruetman were co-owners of Altec–1.

In August 1987, Altec–1 entered into an agreement with Guemes. By late 1987, however, Bruetman apparently was conducting business through Altec–1 that was unrelated to the Guemes agreement but benefited Bruetman and High Tech. Herbstein alleges that he discovered this activity and brought it to Bruetman's attention, and, as a result, Altec–1 was reformed into IxC and Bruetman formed Altec–2 as a new, separate venture.

IxC was incorporated in December 1987. At first, Herbstein and Bruetman each owned 50% of the corporation. Bruetman transferred his share to Altec–2 in August 1988. Altec–2 originally had three shareholders: High Tech, with 49%; Carlos Bruetman, Bruetman's son, 43%; and Herbstein, 8%.

Herbstein's Complaint describes three phases of fraud in which the Defendants allegedly participated: (1) Bruetman fraudulently obtained money from Herbstein as capital contributions to Altec–1 and for the formation of IxC; (2) the Defendants fraudulently misappropriated and transferred money from IxC; and (3) the Defendants fraudulently attempted to divest Herbstein of his interests in IxC.

The first phase concerns whether or not Herbstein and Bruetman provided equal contributions to Altec–1. At various times in 1987, Bruetman would call Herbstein to inform him that funds were needed to cover construction costs and to instruct him to deposit half of the funds required in a bank account in Chicago. The account was in the name of both Bruetman and his son, Carlos, a medical student in Argentina. Carlos apparently had the checkbook for the account in Argentina and would issue checks to the contractors as needed. Herbstein transferred $110,100[2] into the account between April and August 1987, and Carlos issued checks totaling about $127,000 for construction costs during that period.

Bruetman documents a separate set of contributions made to Altec–1 by himself, High–Tech, Herbstein, and Philips Medical Systems ("Philips"). His calculations are based on cash contributions and contributions arising out of a set of international bond transactions ("Bonex transactions"). However, part of Bruetman's personal cash contribution appears to have been from the proceeds of a loan made by Continental Bank in Chicago, and he lists the Philips contribution as being wholly to his own benefit. Whether Bruetman was entitled to credit for the Philips contribution is disputed, and not certain from the record.

The second part of the scheme allegedly involved Bruetman's removal of funds from Altec–1 primarily through a series of Bonex transactions. Apparently the Defendants accomplished this by purchasing bonds through Altec–1 at a deep discount and recording the face value of the bonds on the corporation's books.

---

1. None of the parties have fully complied with Local Rule 3(g). The Defendants have failed to submit "short and concise" statements, while the Plaintiff, given the circumstances, reasonably relies on past affidavits. For the purposes of these motions, the Plaintiff's affidavits are treated as submitted under Local Rule 3(g), and the merits of the motions addressed directly.

2. All money amounts to which this opinion refers are stated in United States Dollars. Payments made in Argentine australes are stated in their dollar-equivalent using the existing exchange rate at the time of payment.

The third phase of the alleged scheme was the Defendants' attempts to convert Herbstein's interests in the subsequent companies by revising IxC's financial records. At the core of this part of the scheme was the issuance of I.R.S. Form 1099s purporting to show that the HTMP Guarantee Venture had participated in Bonex transactions benefitting Herbstein, Bruetman, and High Tech. The transactions were said to have occurred in September 1987, although the Form 1099s list the sale date as 10/24/88. The Form 1099s also contain a number of other facial inconsistencies, and Herbstein had no knowledge of such a venture or of these sales.

*Discussion*

I. The Collateral Estoppel Motion

The Collateral Estoppel Motion is based entirely on the temporary dismissal of the Argentine criminal investigation by Judge Garcia–Mendez on October 10, 1990. The Defendants contend that, because Herbstein submitted some evidence to that tribunal which he also will rely on here, he is collaterally estopped from relitigating those issues by virtue of comity and principles of estoppel, and that they therefore are entitled to summary judgment.

As stated in this Court's previous Opinion, the Supreme Court has defined comity as "the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and conveniences, and to the rights of its own citizens or of other persons who are under the protection of laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) (quoted in *Herbstein I,* 743 F.Supp. at 187).

■ Generally, foreign and domestic courts should exercise jurisdiction concurrently. If a judgment is reached first in the foreign court, it can be pled as res judicata in the domestic proceeding. *Herbstein I,* 743 F.Supp. at 188; *See China Trade & Development Corp. v. M.V. Choong Yong,* 837 F.2d 33, 36 (2d Cir. 1987). *Herbstein I* did not stay this action under principles of comity since "neither

the parties nor the issues are identical or significantly similar". 743 F.Supp. at 188.

■ Nevertheless, the Defendants now argue that Herbstein had a full and fair opportunity to litigate these issues in Argentina, and that the temporary dismissal of the criminal/civil investigation was a final determination on the merits. Therefore, despite the prior ruling, they contend principles of comity mandate that collateral estoppel effect be given to the Argentine investigation.

The record plainly belies these contentions. Both Herbstein and Bruetman petitioned to have themselves classified as "victims" under the applicable law, in the long-term hope of receiving some remuneration at the end of the criminal proceedings and practically to attempt to direct the investigation. The Argentine court denied both of their petitions and instead designated IxC the victim of the matters under investigation. Thus, as noted in *Herbstein I,* neither was a party to the investigation. Indeed, neither of them would be barred from initiating their own civil suit in Argentina on the same facts. *See* Garro Aff. 13–14. Herbstein therefore has not had an opportunity to fully and fairly litigate the issues and will not be barred from doing so on this basis. *See Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984).

Second, the temporary dismissal of the action does not constitute a final adjudication on the merits. The investigation of the Argentine court was temporarily dismissed to await the submission of new evidence that would allow the investigation to go forward. Although perhaps practically dispositive, such an action on its face does not appear to be final. Moreover, since that order was issued, additional discovery has taken place in this action which might cast that determination in a different light. The Argentine investigation therefore will not be given any collateral estoppel effect in this action, and the Defendants' motion for summary judgment on this ground is denied.

## II. The Summary Judgment Motions

In addressing the Defendants' remaining summary judgment motions, the following standard will be applied:

> Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim. *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (citations omitted).

As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991); *see also Bay*, 936 F.2d at 116.

### A. *The Joint Summary Judgment Motion*

■ The Defendants jointly contend that most of their actions were immaterial, that the Form 1099s fail to show a scheme to defraud Herbstein, and that Herbstein cannot show a causal link between any of their actions and his loss.

The first contention is based in part on Herbstein's subsequent acceptance of an interest in Altec–2 and IxC after he learned of High Tech's role in Altec–1, and on the assertion that both Herbstein and Bruetman contributed equally to Altec–1. When Herbstein accepted the subsequent interests in the two new companies, however, it appears that he did not fully know how widespread the alleged fraud was. The current record only shows that he had learned of High Tech's participation in the enterprise and that business was being conducted outside the venture's scope. The record does not show that Herbstein knew of, among other things, the alleged fraud in the Bonex transactions. It therefore can be inferred that the Defendants induced Herbstein into accepting the investment in the two new entities in furtherance of the alleged scheme, and not as an accord and satisfaction nor as a settlement of any claims Herbstein may have had at that time, precluding summary judgment.

Multiple questions also exist concerning the contributions made to Altec–1 and their sources. In particular, Bruetman's use of the $80,000 received from Philips is highly questionable, and much of High Tech's contribution, which Bruetman claims was made on his behalf, appears to have been made outside of the relevant time period and might have been made in connection with a separate relationship it had with Philips.[3] The Defendants therefore are not entitled to summary judgment on this ground.

As to the Form 1099s, the Defendants' argument borders on the frivolous. They simply assert that the Forms establish they were not stealing from Herbstein and that the existence of the Forms shows that there was no scheme to deprive Herbstein of his interest. This argument ignores the facial inconsistencies on the Forms that raise multiple questions concerning when and why they were issued. Moreover, the Defendants fail to offer any evidence explaining the circumstances surrounding the creation of the Forms to rebut Herbstein's description of the events in question. If established, Herbstein's account would go a long way towards showing the Defendants did indeed participate in a scheme to divest Herbstein of his interest in the companies. The Defendants' simple attempt to brush aside the many questions of fact surrounding the Forms and the inferences arising from them is thus far from meeting their burden on a motion for summary judgment.

---

3. This relationship, among other things, is the subject of the Chicago Action.

■ The Defendants also contend that even if a misrepresentation took place, Herbstein cannot show that the misrepresentation directly cause Herbstein to suffer an injury. Under New York law, in a fraud action "the damages must be the direct result of the defendant's wrongful actions and must be independent of other causes." *Idrees v. American University of the Caribbean*, 546 F.Supp. 1342, 1350 (S.D.N.Y.1982). The Defendants argue that because external forces led to IxC's demise, causing Herbstein's loss, and not their own actions, they are not liable.

Herbstein argues, however, that the Defendants sought to put IxC out of business and have High Tech, over which Bruetman exercised almost exclusive control, assume IxC's profitable operations. The alleged attempt to recharacterize equity as debt and to generate false entries on IxC's books showing non-existent loans from High Tech would be consistent with such a scheme. Although Herbstein has not submitted much evidence in support of his argument, the Defendants, upon whom the burden rests, have failed to provide any evidence that would entitle them to judgment as a matter of law. Therefore, assuming the Court would adopt their causation theory, the Defendants have failed to establish that their allegedly fraudulent actions did not cause Herbstein any injury as a matter of law.

The Defendants also seek summary judgment on Herbstein's RICO claim on the ground that there was no fraud committed upon which Herbstein can base such a claim. However, the Defendants are not entitled to summary judgment on the fraud claims, and they have failed to set forth any other reason why summary judgment should be granted on the RICO claim. Their joint motion for summary judgment is therefore denied in its entirety.

### B. *Keill's Summary Judgment Motion*

■ Keill allegedly was at an IxC shareholder meeting in Argentina in May or June 1989 during which Herbstein was apparently denied his right to vote his shares, and allegedly signed letters in connection with the Bonex transactions stating that

$621,000 of the bonds were for High Tech's benefit. These letters and transactions were allegedly used later by High Tech to claim that it had loaned this amount to IxC. Keill contends that he was not at the meeting in question and that, assuming he did sign the letters in question, Herbstein has suffered no loss as a result of his actions.

In arguing that he is entitled to summary judgment as to the 1989 meeting, Keill cites to paragraphs within his Local Rule 3(g) statement which in turn cite to his pleadings and to proposed contentions in his Pre–Trial Order. Keill has not submitted a sworn affidavit nor any other admissible evidence in support of this argument. Furthermore, Keill contends that he was not at a board of directors meeting, but is silent as to whether he was present at a shareholders meeting. This aspect of his summary judgment motion is therefore denied. Fed.R.Civ.P. 56(e).

■ As to the causation issue, a key part of the alleged fraud in its early stages was the Bonex transactions. Keill admits to having signed the letters in question, which were allegedly later used in an attempt to characterize the transaction as a loan by High Tech to IxC. Whether Keill's acts, in light of the entire record, caused Herbstein to suffer a loss, though, remains to be resolved. Multiple inferences can be drawn from the letters' existence and the potential role Keill played. Furthermore, Keill has not contested Herbstein's scienter allegations in the context of this motion. Therefore, whether his alleged wrongs caused Herbstein's loss remains a question to be resolved by the trier-of-fact. His motion for summary judgment is denied.

### C. *Agudelo's Summary Judgment Motion*

Agudelo sent a number of allegedly fraudulent letters on High Tech's behalf asserting an interest in IxC, assisted in preparing the Form 1099s, and participated in a guaranty arrangement between High Tech and Herbstein by allegedly sending false letters despite Keill's warning not to do so.

Agudelo principally argues that Form 1099s show no scheme to defraud Herbstein existed and that any damages Herbstein suffered were not a result of his and the other Defendants' activities. The Defendants as a whole are not entitled to summary judgment on these grounds, and Agudelo has presented no additional facts that would require a contrary individual result. His motion for summary judgment is therefore denied.

D. *Tash's Summary Judgment Motion*

Tash apparently is the secretary and outside legal counsel to High Tech. He participated in the preparation and filing of the Form 1099s, and sent a number of letters which are alleged to have been extortionate or fraudulent.

Tash also principally argues that Form 1099s show no scheme to defraud Herbstein existed and that any damages Herbstein suffered were not a result of his and the other Defendants' activities. The Defendants as a whole are not entitled to summary judgment on these grounds, and Tash has presented no additional facts that would require a contrary individual result. His motion for summary judgment is therefore denied.

III. The Default Judgment Motion

Herbstein seeks a default judgment pursuant to Rule 37(b) of the Federal Rules of Civil Procedure for the failure of certain of the Defendants to comply with the discovery orders of October 3, 1991, and March 10, 1992. The underlying documentation sought by Herbstein pertains to his claim for punitive damages.

Entering a default judgment for a violation of a discovery order is a drastic step, one which should not be taken absent willful or culpable disobedience. *Luft v. Crown Publishers, Inc.*, 906 F.2d 862, 865 (2d Cir.1990); *see United States v. Aldeco*, 917 F.2d 689, 690 (2d Cir.1990). "Standing alone, a single pretrial violation ... would not ordinarily result in an imposition of a

sanction of such finality...." *United States Freight Co. v. Penn Central Transportation Co.*, 716 F.2d 954, 954 (2d Cir. 1983).

The Defendants subject to the October order failed to abide by that order, causing Herbstein to return to Court and seek a second order compelling discovery. The second request was made soon after the default and attachment order were entered in the Chicago Action, and it appears as if the Defendants attempted to comply with the Order while seeking to overturn the result of the Chicago Action. Nevertheless, they failed to comply fully with the Order. Although these Defendants come perilously close to having a default entered against them, under the circumstances and given that this discovery matter concerns a collateral matter, Herbstein's motion for a default judgment is denied at this juncture. *Luft*, 906 F.2d at 866.[4]

*Conclusion*

For the reasons set forth above, the Defendants' motions for summary judgment are denied in their entirety. The Plaintiff's motion for a default judgment is denied.

It is so ordered.

---

4. In the alternative, Herbstein seeks to fix punitive damages at $1,000,000 in the event the Defendants are found liable. For the same reasons, this request is denied as well. *See Luft*, 906 F.2d at 866. Herbstein's request for additional security is unnecessary at this time given the recent posting of security by the Defendants.