**J. BARANELLO & SONS, Plaintiff,**

v.

**HAUSMANN INDUSTRIES, INC., Defendant.**

**No. 77 CV 2294 (ERN).**

United States District Court, E.D. New York.

Sept. 9, 1983.

See also, D.C., 86 F.R.D. 151.

Robert D. Clark, New York City, for plaintiff.

Carro, Spanbock, Londin, Fass & Geller by Charles D. Bock, New York City, for defendant.

**MEMORANDUM AND ORDER**

NEAHER, District Judge.

Plaintiff J. Baranello & Sons, a New York partnership, instituted this diversity action against Hausmann Industries, Inc., a New York corporation, for damages resulting from an alleged breach of contract. The action was tried without a jury over a three-day period. At the close of trial, and upon cross-motions for judgment on liability, this Court ruled that defendant had indeed breached the contract in question, but reserved decision on damages. Defendant has now moved to reargue the liability issue under Rule 60(b), F.R.Civ.P. For the reasons stated below, which also constitute the Court's findings of fact and conclusions of law, F.R.Civ.P. 52, defendant's motion is denied, and plaintiff is awarded $31,439 plus interest for breach of contract.

The dispute between the parties arises out of a federally funded, public works project sponsored by the New York State Facilities Development Corporation ("FDC") to refurbish the Suffolk Development Center in Melville, New York, a State institution for the mentally retarded. In October 1976, plaintiff prepared and submitted a bid to perform the general construction work on this project and to provide and install 444 wardrobes in the Center's dormitories. In so doing, it relied on a bid quoted by defendant, a subcontractor, for the fabrication and delivery of the wardrobes. In December 1976, after the FDC awarded the contract to plaintiff as low bidder, plaintiff and defendant began discussing the specific details of the wardrobe subcontract. They exchanged letters setting forth the price and schedule of delivery and establishing the FDC architect's approval of defendant's shop drawings as a condition of their contract. When the architect approved the shop drawings but requested changes, the parties renegotiated their terms. In letters exchanged during April 1977, defendant apparently agreed to build the wardrobes in compliance with all FDC specifications, and plaintiff accordingly agreed to pay a higher price. According to plaintiff, defendant breached this con-

tract in May when it refused to manufacture the wardrobes in compliance with two specific FDC requirements.

At the trial and on its motion to reargue, defendant claimed it was not in breach of contract, arguing that it never agreed on all the specifications of the wardrobes and hence never had an enforceable agreement. Specifically, defendant argued that the bargaining history demonstrated that its April 1977 letter was not an acceptance, but merely one volley in an ongoing series of negotiations on the specification issue. Alternatively, defendant asserted that its apparently clear acceptance of plaintiff's contractual terms was in fact ambiguous, and when viewed in light of the discussions preceding the April letters, could be construed as encompassing some but not all of the FDC specifications requested by plaintiff in its April letter. Both arguments require close analysis of the events leading up to the April letters.

A. *The Bargaining History*

The relatively uncontested testimony adduced at trial revealed the following. On October 27, 1977, approximately one hour before plaintiff submitted its bid on the FDC contract, defendant phoned plaintiff to bid on the subcontract for the wardrobes. Although defendant had read the published FDC wardrobe specifications, and knew that the FDC required adherence to its specifications, its bid of $104,437 was based on manufacturing the wardrobes according to its standard design. Plaintiff was concerned and questioned defendant about the differences between defendant's specifications and those required by the FDC. According to testimony of plaintiff's agent, which this Court credits, defendant replied that its wardrobe would obtain FDC approval. The only major variation cited was defendant's inability to provide the required polyester molding; no mention was made of other deviations.

On the same day, but after plaintiff submitted its bid to the FDC, defendant sent plaintiff a signed written confirmation of its bid stating that it would build the wardrobes according to the specifications depicted in an attached brochure. As it subsequently developed, the specifications depicted in defendant's brochure (which, incidentally, did not include the specific type of wardrobe sought by plaintiff) differed from the FDC's requirements on six major points: the grade of fire-retardant material; the style of hinge; the removability of panels; the absence of subframes; the substitution of plastic for hardwood drawers; and the absence of the polyester moldings.

After plaintiff was awarded the FDC contract, agents from both companies met to discuss the details of the project. Defendant again assured plaintiff that while its standard manufacturing procedures differed somewhat from FDC specifications, the variations were minor and would not preclude final State approval. In particular, defendant's agent made it clear that his company recognized the importance of meeting the State's stringent fire retardancy requirements and agreed that the wardrobes would fully comply with this specification. Both sides agreed, however, that an attempt would be made to obtain FDC approval of defendant's proposed use of vinyl "T" molding in place of the specified polyester edging, and that plaintiff would obtain the mirrors for the wardrobes from an alternative source. Based on these understandings, the parties arrived at an agreed price of $97,250.

On December 14, 1977, plaintiff sent defendant a letter memorializing its understanding of this meeting and subsequent phone calls, which stated:

> Subject to the approval of the Architect, it is our intent to award the manufacture of all wardrobes for the referenced project to your firm. All work to be in accordance with contract plans and specifications, specifically Section 10900 entitled Wardrobe Units. There are 444 units included. The total lump sum contract price will be Ninety-Seven Thousand Two Hundred Fifty Dollars and 00/100 ($97,250.00).

"Section 10900" referred to the FDC's published wardrobe specifications. Defendant

responded on December 28, 1977, with an acknowledgment stating:

In lieu of polyester edging specified for wardrobes, we propose to furnish vinyl "T" moulding, or self-edging in high pressure laminate.

Our proposal is based on furnishing all units as itemized and described in the quantities shown in our schedule, and fabricated in accordance with our enclosed specification.

As these letters were exchanged, defendant prepared and submitted the first of several shop drawings to plaintiff for transmission to the architect. Plaintiff, however, noticed that the shop drawings failed to include various FDC-required items in addition to the polyester edging. Realizing that the FDC would never approve all the deviations as a matter of course, plaintiff never forwarded the shop drawings, and instead engaged in discussions with the architect concerning the acceptability of the modifications. These discussions met with uniformly negative results. Specifically, the architect disapproved the proposed use of vinyl "T" molding, the inclusion of low grade fire-retardant material, and the fixed panel design.

During a meeting on February 15, 1978, to discuss the architect's objections, plaintiff agreed to provide the required polyester molding at its own expense, but insisted that defendant comply with the fire retardancy and removable panel requirements. Defendant, in turn, orally agreed to meet these demands if the contract price were increased, but stressed that it would implement its own plans for at least two of the three remaining discrepant details: the subframe and the hardwood drawers. Defendant repeated its reservation as to the subframe in a letter dated February 16, 1978:

Before proceeding further to obtain approval of Hausmann Wardrobes for the subject project, we will require your acceptance of our revised proposal of $120,000 to cover additional costs that will be involved to meet the requirements of the New York State Facilities Development Corporation.

As explained during our conversation of February 15, 1977, in order to meet F.D.C. requirements, it will be necessary to amend our specifications, method of assembly and construction. This amendment of our specifications would include Class "A" Fire Retardant construction, removable and replaceable panels fastened with screws (no glue). It would not include a metal or wood sub-frame.

On March 4, plaintiff proposed a compromise of $108,000 to cover defendant's "additional expenses." In this letter, plaintiff claimed that it was prepared to procure the molding itself since it had been alerted to this potential problem before it composed its bid, but stressed that its understanding at the time of the bid was that defendant would comply with all other FDC specifications, including the subframe requirement. This letter also made it clear that the time for negotiations was rapidly passing and that manufacturing problems had to be resolved expeditiously.

Despite the continuing disagreement on price and compliance with other FDC specifications, defendant submitted a revised shop drawing on March 29, 1978, correcting the fire retardant material and the removability of the panels and the hinges. On April 4, however, the architect returned the drawing stamped "Approved As Noted . . . Resubmission Is Required." The architect noted objections to the absence of hardwood drawers and the method by which defendant proposed to achieve the removability of the panels.

After receiving the architect's objections, plaintiff wrote defendant on April 12, stating:

This letter supersedes the letter of intent previously sent to you dated December 14, 1976. A formal contract is being prepared and will be sent to you shortly in the amount of $114,625.00.

All work will be in accordance with contract drawings and specifications, section 10900 entitled "Wardrobe Units". Four hundred forty-four (444) units are included. Wardrobes shall be manufactured us-

ing fire-retardant material as stated in the specifications.

As indicated in my letter of March 4, 1977, the polyester edging will be applied by others .... "

Defendant responded with a letter on April 15 stating:

AUTHORIZATION: REVISED LETTER OF INTENT 4/12/77 ADDITIONAL COSTS FOR AMENDING SPECIFICATIONS, METHOD OF ASSEMBLY AND CONSTRUCTION OF WARDROBES TO MEET F.D.C. REQUIREMENTS. POLYESTER EDGING TO BE FURNISHED BY OTHERS. ADJUSTED COSTS REFLECT $2000 CREDIT FOR OMISSION OF CORK BOARDS

ADDITIONAL COST                    17,375.00

On April 22, 1977, defendant submitted its third shop drawing, again without including hardwood drawers or subframes. This time the architect objected not only to the absence of the hardwood drawers, but also to the omission of the subframe. Plaintiff immediately forwarded these objections to defendant who responded, in a letter dated May 20, 1978, that it could not comply with the architect's requests without further price negotiations. Defendant argued that the addition of hardwood drawers would alone cost $44,000, and that it was unreasonable to assume that this cost was included in the $17,375 compromise. It argued further that the subframe had been specifically excluded from the compromise by its February 16th letter. Plaintiff maintained, however, that defendant's April 15th letter bound it to comply with all FDC specifications, and informed defendant it was in breach of contract.

## B. *Discussion*

■ As noted above, after hearing all the testimony, this Court concluded that defendant's April 15th letter was a timely acceptance of plaintiff's April 12th offer and that a contract was formed at this point pursuant to New York's version of U.C.C. § 2–207.[1] Under that section, a contract is formed by an exchange of correspondence if the documents demonstrate agreement on the essential terms of the

parties' bargain. J. White & R. Summers, Uniform Commercial Code § 1–2, at 27 (2d Ed.1979). In this instance, both letters not only agreed on the price and quantity of the wardrobes, but the plain language of the letters indicated that both sides had reached an understanding on the crucial manufacturing specifications. Thus, looking at the letters themselves, the conclusion that an agreement had been reached seems inescapable. *See V'soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

Nevertheless, this Court recognizes that words are notoriously slippery symbols, and often the meaning intended is not the meaning conveyed. Thus, the Court agrees with defendant that the crucial question in this case, as in any contractual formation dispute, is whether defendant "intended" its April 15th letter to manifest assent to the terms contained in plaintiff's letter of April 12th. The Court cannot agree, however, that this question is governed by the subjective intentions of either party.

■ As stated by Judge Learned Hand in the oft-quoted excerpt from *Hotchkiss v. National City Bank,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913),

A contract has, strictly speaking, nothing to do with personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.

This objective approach to the problem of contract formation has long been the law in

---

1. Both sides have relied upon New York law in support of their respective positions, assuming correctly that it would govern in this action where the plaintiff is a New York corporation, much of the negotiations took place in New York, and the contract called for performance in New York.

New York, *see, e.g., Philip v. Gallant,* 62 N.Y. 256, 263 (1875), which the New York Court of Appeals only recently reiterated. *Brown Brothers Electrical Contractors, Inc. v. Beam Construction Corp.,* 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977).

■ The New York rule has been stated succinctly: "What is looked to in determining whether an agreement has been reached is not the parties' after-the-fact professed subjective intent but their objective intent as manifested by their expressed words and deeds at the time. If the parties' expressions and conduct would lead a reasonable man to determine that they intended to reach a binding agreement, their agreement will be enforced." *Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1275 (S.D.N.Y.1981) (citations omitted).

Applying this test to the instant case, it seems clear that both sides reasonably understood each other's April letter to bind the other to the terms expressed therein. Certainly, defendant evinced every indication that its performance of the agreement would be forthcoming. Indeed, defendant does not now claim that its letter was to have no effect; rather defendant concedes that if the FDC had not objected to the April 25th shop drawing, neither side would now be seeking this Court's assistance. Instead, the thrust of defendant's contention appears to be that the subsequent dispute over which FDC specifications it had agreed to in its April 12th letter reflected a fundamental misunderstanding between the parties, which precluded the formation of a contract.

While advanced as a question of contractual formation, this argument presents essentially a question of contractual interpretation. *See* Restatement (Second) of Contracts § 20 (1981). In construing agreements, the New York courts have made it clear that "the aim [of the court] is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 555, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982). However, "unless there

are reservations to the contrary, embraced in the interpretative result should be 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.' " *Id.* (quoting *Rowe v. Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978)); *see* Restatement (Second) of Contracts § 201 (1981).

Applying this test to the letters brings the Court full circle. Read literally, the April letters clearly indicate that defendant agreed to produce the 444 wardrobes in accordance with FDC requirements. The April 15th letter offered no reservations or objections to plaintiff's plain and unambiguous insistence upon complete compliance with the published FDC specifications. Defendant simply agreed to amend its specifications "to meet FDC requirements" for the additional cost of $17,375. Thus, a reasonable person in plaintiff's position would naturally have assumed that defendant had finally acquiesced to plaintiff's insistent demand that FDC requirements be met.

Nevertheless, defendant contends that plaintiff knew or should have known that it was agreeing only to those FDC specifications discussed in the February meeting. In making this argument defendant asserts that the bargaining history demonstrates plaintiff's understanding of what defendant was offering when it agreed to comply with "FDC specifications." Specifically, defendant argues that the phrase "FDC requirements" should be given the same import it had in defendant's February letter. In that letter, defendant offered to meet FDC requirements in one paragraph, but continued to explain in another that it did not intend to comply, at that point, with all the requirements.

This argument, however, seeks to give this letter more significance than it can bear. The bargaining history outlined above also shows that plaintiff always insisted that defendant meet all requirements imposed by the FDC; indeed, plaintiff by its own contract was bound to supply FDC-approved materials. At best, the February letter shows that in the early stages of

negotiations, plaintiff may have been willing to tolerate defendant's attempt to convince the FDC that certain substitutes were acceptable. Both parties, however, knew that plaintiff was not in a position to waive requirements sought by the FDC.

Consequently, throughout their negotiations in February and March, both parties were clearly bargaining on the question of who would accept the financial risk of FDC disapproval of the substituted specifications. As its March 4th letter shows, plaintiff initially accepted that risk on defendant's assurance that its specifications would not differ drastically from those required by the FDC. This letter also made it clear that plaintiff was still willing to bargain on the question of a final price for FDC compliance, but the time for negotiations was fast running out, and that it was imperative that the parties agree on a price quickly. Finally, in April, the plaintiff could no longer tolerate the delay and the uncertainty engendered by defendant's specifications and made what was clearly a final offer. By accepting this offer, plaintiff could only assume that defendant was agreeing not only to satisfy the objections already raised by the FDC and discussed in their earlier negotiations, but was also willing to shoulder the financial risk of having to meet future objections as well.

If defendant intended, as it now argues it did, to continue negotiations at the risk of FDC disapproval, but to concede in the interim to three specific requirements, it could have qualified the term "FDC requirements." In fact, as defendant's February letter shows, it had always done so in the past. The unqualified language of the April 15th letter is particularly significant in light of defendant's prior insistence that it build according to its own specifications, and the fact that it was alerted to a controversy over the subframes by plaintiff's March 4th letter and over the hardwood by the April 4th architect disapproval. Defendant knew these requirements were at issue and cannot now argue it was unaware of the consequences when it agreed to comply with "FDC requirements" without specifically delineating which ones. Rather,

given the time pressures, the most likely conclusion to be drawn is that defendant knew plaintiff would no longer bargain on the specifications and in order to obtain the contract defendant was willing to take the risk of convincing the FDC. In any event, it is clear that plaintiff had no reason to know that defendant's agreement to comply with "FDC requirements" was in reality an agreement to comply with only *some* FDC requirements. Under these circumstances, defendant must be held to the reasonable meaning of its own words. *See* Restatement (Second) of Contracts § 232 (1981).

■ Defendant's other challenges to this Court's ruling on liability merit little discussion. Defendant claims that the architect's approval described in plaintiff's December letter of intent remained a condition precedent to the formation of any binding contract. Plaintiff's April 12th letter, however, clearly stated that it superseded the December letter and did not mention architectural approval. This is, of course, understandable since under the terms of the April agreement, compliance with all FDC requirements was mandatory. Moreover, even if the term survived, it does not preclude plaintiff's recovery: Testimony adduced at trial established that the architect's April 4th approval, although qualified, was sufficient to satisfy the condition.

■ Defendant also claims that the letter should not be considered a finalized agreement because the parties never reached an understanding on how to accomplish the logistics of shipping the wardrobes to a third-party manufacturer who had contracted to apply the FDC-required polyester molding. Under New York law, however, the parties need not agree on every aspect of their bargain before an enforceable contract is reached. See N.Y.U.C.C. § 2–204 (McKinney 1967). As the New York Court of Appeals held in *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972 at 973, 395 N.Y.S.2d 151, 363 N.E.2d 701 (1977):

Under the Uniform Commercial Code [2–204(3)], if the parties have intended to

contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open .... It is no longer true that dispute over material terms inevitably prevents formation of a binding contract. What is true ... is that when a dispute over material terms manifests a lack of intention to contract, no contract results.

\* \* \* \* \* \*

Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract ....

*Accord United States v. Bedford Assoc.*, 657 F.2d 1300, 1310 (2d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982). Since the application of the molding was not essential to the parties' agreement, the parties' failure to work out this detail is not fatal to plaintiff's claim. *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 453–54 (2d Cir.1977).

■ Plaintiff may therefore recover damages to the extent that its demand is justified. The evidence indicates that on June 1, 1977, plaintiff contracted with TMI Systems, Inc. ("TMI") to provide the wardrobes in defendant's stead. The contract called for plaintiff to pay TMI $166,797 and for TMI to complete delivery by January 1978. TMI was 13 months late on delivery, and plaintiff claims that 10 months of that delay was caused by defendant's breach. Plaintiff therefore claims damages to compensate for the difference in the contract prices and for the expenses it incurred, including the cost of storing, supervising and insuring the wardrobes during that 10-month period.

Under U.C.C. § 2–712 a party may cover its loss by procuring a substitute contract after breach, and recover the difference in the price less any expenses saved. The difference in this case is offset by plaintiff's savings of $15,839 on molding and $4,884 on

mirrors that it had agreed to obtain at its own expense, but which were supplied by TMI under its contract with plaintiff. Plaintiff may therefore recover the adjusted difference of $31,439.

Defendant points out that the TMI contract price of $166,797 was subject to "additions and deduction by Change Order," and would give some significance to the fact that plaintiff still owes TMI $6,892. It has not, however, submitted any evidence that plaintiff and TMI actually altered the price, while plaintiff provided both documentary and testimonial evidence that the price remained the same. The recovery, therefore, will not be reduced by the amount still owed on the substitute contract.

■ Plaintiff's claim for consequential damages under U.C.C. § 2–712, however, must be denied. As noted above, plaintiff's contract with TMI specifically required TMI to deliver the 444 wardrobe units within the same time schedule previously agreed to by defendant. In fact, plaintiff's agreement with TMI expressly provided that time was of the essence. The undisputed testimony at trial demonstrated that TMI made no deliveries until December of 1977, at which time it produced only 40 to 50 wardrobes. TMI thus missed its contractual obligation to deliver 50 wardrobes by September 30, 1977; 296 wardrobes by October 15, 1977; and the remaining 142 wardrobes by December 15, 1977. While these delays may have caused plaintiff extra expenses, plaintiff produced no evidence linking the delays to defendant's breach of contract. Indeed, plaintiff's own agent testified that if TMI had delivered the wardrobes according to schedule, the wardrobes could have been installed according to the timetable set by the FDC. Under these circumstances, the Court concludes that to the extent plaintiff can recover damages for delay, plaintiff must look to TMI for compensation.

Accordingly, the Clerk of Court is ordered to enter judgment for plaintiff against defendant in the amount of $31,439 with in-

terest from June 1, 1977, pursuant to N.Y. CPLR § 5001(b) (McKinney 1963).

SO ORDERED.