Peter G. JANOVER, Plaintiff,

v.

BERNAN FOODS, INC., The Axmar Investment Company, Robert Marcus, Betty Marcus, The Birchall Investment Company, and The Ziuta G. Akston Trust, The Betty G. Marcus Trust # 1, The Betty G. Marcus Trust # 2, The Betty G. Marcus Trust # 3, in their capacities as partners of The Axmar Investment Company, and The Betty G. Marcus Trust # 4, The Betty G. Marcus Trust # 5, The Robert P. Marcus Trust # 1, and The Robert P. Marcus Trust # 2, in capacities as partners of The Birchall Investment Company, Defendants.

No. 92 Civ. 5454 (DAB).

United States District Court,
S.D. New York.

Oct. 16, 1995.

Carter K. Combe, Roberts & Finger, New York City, for plaintiff.

Elliot G. Sagor, and Judith Cohen, Squadron, Ellenoff, Pleasen & Lehrer, New York City, Jeffrey G. Pittell, The Law Firm of Edward Tanenhaus, New York City, for defendants.

## OPINION

BATTS, District Judge.

Peter G. Janover ("Plaintiff") moves for partial summary judgment to collect severance benefits pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, or, alternatively, under New York State contract law, and for a declaration that a separate future services agreement is unenforceable. Defendants cross-move for partial summary judgment concerning the severance benefits, and also move for partial summary judgment for monies received by Plaintiff under a separate consulting agreement.

## I. BACKGROUND

On June 24, 1987, Plaintiff and Defendants Bernan Foods, Inc. ("Bernan") and Axmar Investment Company ("Axmar") signed an employment agreement (the "Employment Agreement") (Peter G. Janover Decl. in Support of Plaintiff's Motion for Partial Summary Judgment, [hereinafter "Janover"], Ex. A) whereby Plaintiff would serve as Bernan's President and Chief Operating Officer for a term of five years. At this time, Axmar owned Bernan, and signed the Employment Agreement as guarantor of Bernan.

Defendants Robert and Betty Marcus ("the Marcuses") were the primary shareholders in Bernan, Axmar, and the Birchall Investment Company ("Birchall"). Upon signing the Employment Agreement, the Marcuses informed Plaintiff that his primary goal would be to sell Bernan within the next five years. As this goal conflicted with Plaintiff's interest in continued employment with Bernan, the Employment Agreement included severance benefits, or a "golden parachute" provision. Under the golden parachute provision, Plaintiff would be entitled to substantial monetary compensation if his termination was triggered by the sale of Bernan, as long as he did not continue to work for either Bernan or the purchaser of Bernan. Furthermore, the golden parachute created an incentive to sell Bernan quickly, by including a clause which decreased the amount of severance benefits Plaintiff would receive, the longer it took him to sell the company.

Defendant Robert Marcus, acting on behalf of Axmar, and Plaintiff signed a severance agreement, dated December 28, 1995, yet signed December 29, 1995 (the "Severance Agreement") (Janover Decl., Ex. D). In the Severance Agreement, Axmar agreed to increase the amount of Plaintiff's severance benefits under the Employment Agreement from 18 months of his regular, monthly salary to 27 months. The parties further agreed that Plaintiff would receive up to

$6,200 for out-placement expenses for the first 12 months following his termination.

On December 29, 1989, Axmar sold Bernan to the Marcuses' son-in-law, Raymond Hughes ("Hughes"). On January 4, 1990, Plaintiff sent a letter of resignation, effective April 4, 1990, to Hughes, with a copy to the Marcuses, also requesting severance benefits as provided for in the Employment Agreement.

Hughes and the Marcuses then requested that Plaintiff continue to work for them until Bernan was sold to a buyer outside of the Marcus family. On March 18, 1990, Plaintiff sent the Marcuses a memorandum stating that he would draft a letter to the Marcuses and Hughes in order to protect his severance benefits should he remain under their employ beyond April 4, 1990. On March 26, 1990, Plaintiff delivered to Robert Marcus a written letter agreement ("Extension Agreement") (Janover Decl., Ex. G). The Extension Agreement, signed by Plaintiff, Hughes on behalf of Bernan, and Robert Marcus on behalf of Axmar, stated that Plaintiff would continue to work for Bernan beyond April 4, 1990, but that

> the continuation of [Plaintiff's] employment, beyond April 4, 1990, does not, in any way, revoke [Plaintiff's] resignation ... under the [E]mployment [A]greement ... or the severance benefits accrued thereunder and the additional benefits granted by AXMAR in our letter agreement dated December 29th, 1989 [i.e., the Severance Agreement].

Janover Decl., Ex. G at 1.

Plaintiff continued to work for Bernan after April 4, 1990. In November 1991, Plaintiff began negotiating with Wilton Foods, Inc. ("Wilton") to sell Bernan. On February 1, 1992, Plaintiff entered into a consulting agreement (the "Consulting Agreement") (Janover Decl., Ex. J) with Wilton, whereby Plaintiff would receive $180,000 in exchange for providing consulting services to Wilton after the sale of Bernan's assets to Wilton. On February 6, 1992, Plaintiff, Axmar and Birchall executed a future services agree-

ment[1] (the "Future Services Agreement") (Janover Decl., Ex. I) in which the $180,000 Plaintiff was to receive under the Consultation Agreement, was deemed part of the sale price of Bernan. The money, however, would be treated as compensation to Plaintiff for his future employment with Axmar, Birchall, and their affiliates over the next 18 month period. Plaintiff did receive $180,000; however, Plaintiff never worked for Axmar, Birchall or any of their affiliates after the sale to Wilton.

Following the sale of Bernan's assets to Wilton, Plaintiff continued working for Bernan for a few months. On May 23, 1992, Plaintiff submitted a formal, written resignation from Bernan and requested the severance benefits allegedly owed to him under the Employment, Severance, and Extension Agreements. The Defendants refused to pay the severance benefits.

Plaintiff brought suit against Defendants alleging that the severance benefits provided for in the three Agreements constitute a plan under ERISA, 29 U.S.C. §§ 1001 *et seq.* He argues that Defendants' refusal to pay the severance is a violation of that statute. In the alternative, Plaintiff alleges that New York State contract law also requires that the Defendants pay him pursuant to the Agreements. Plaintiff also argues he is entitled to keep the $180,000 under the Consulting Agreement because the Future Services Agreement is unenforceable.

## II.  DISCUSSION

■ Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir. 1988). As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as

---

1.  The Future Services Agreement provided that should Plaintiff not work for Axmar, Birchall, or its affiliates, the $180,000 would be returned less

$200 for each hour spent working for Wilton as a consultant. Plaintiff, however, could not work more than 10 hours per month for Wilton.

to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the non-movant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO,* 933 F.2d 187, 191 (2d Cir.1991); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

## A. ERISA Claims

Congress passed ERISA in order to protect employees' benefits from misuse or mismanagement by requiring that "disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of [employee benefit] plans." *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 15, 107 S.Ct. 2211, 2219, 96 L.Ed.2d 1 (1987) (quoting 29 U.S.C. § 1001(a)). Determining whether a claim is covered by ERISA requires an examination of whether a "plan" exists as defined by the statute.

ERISA covers both "employee welfare benefit plans" and "employee pension benefit plans." An employee welfare benefit plan is defined as a plan that pays, *inter alia,* benefits described in 29 U.S.C. § 186(c). Section 186(c) includes severance or similar benefits. *See Adams v. Avondale Indus.,* 905 F.2d 943, 947 (6th Cir.1990); *Massachusetts v. Morash,* 490 U.S. 107, 113, 109 S.Ct. 1668, 1672, 104 L.Ed.2d 98 (1989). Thus, Plaintiff's claim passes the threshold test as it addresses a type of benefit plan covered by ERISA.

■ A plan protected by ERISA, however, must utilize an administrative scheme because ERISA is necessarily concerned with the regulation and administration of plan funds. *Fort Halifax,* 482 U.S. at 15, 107 S.Ct. at 2219 ("The statute ... presumes that some type of administrative activity is taking place."). Thus, in determining whether a severance arrangement constitutes a "plan," the existence of an administrative scheme is crucial.

■ Severance benefits which require only one lump-sum payment in the future do not create a "plan" under ERISA because a one-time payment does not entail a true administrative scheme. *See Fort Halifax,* 482 U.S. at 14, 107 S.Ct. at 2218; *Ackner v. Lenox, Inc.,* 782 F.Supp. 267, 269 (S.D.N.Y.1992). Furthermore, ERISA does not define benefits distributed over time as "plans" if they merely require simple arithmetical calculations, are devoid of any discretionary processes, or are standard monthly payments over a pre-determined period of time. *See James v. Fleet/Norstar Fin. Group, Inc.,* 992 F.2d 463, 467 (2d Cir.1993) (payment of benefits for sixty days if employees remained on the job until internal consolidation was complete, found not to be a plan as it was for too short a time period and there was no ongoing administrative program); *Fludgate v. Management Technologies, Inc.,* 885 F.Supp. 645, 648 (S.D.N.Y.1995) (payment of benefits for up to two years did not qualify as an ERISA plan since there was nothing discretionary about the timing, form, or amount of the payments); *Delaye v. Agripac, Inc.,* 39 F.3d 235 (9th Cir.1994) (sending one employee a monthly check and paying insurance premiums for two years as contracted is not an administrative scheme under ERISA).

■ Under the Employment Agreement, Plaintiff was to receive a fixed amount of severance benefits in regular, monthly installments over a set period of time. All of the calculations concerning the amount and timing of these payments were established in the Employment Agreement. Consequently, there was no need for an administrative scheme because there were no uncertain terms necessitating discretionary determinations. As the severance provision provided in the Employment Agreement does not entail an administrative scheme, it cannot be considered an ERISA "plan."

■ In addition, "a contract between an employer and individual employee providing for post-retirement or post-termination in-kind compensation is not a 'plan, fund, or program' within the definitional framework of ERISA." *Jervis v. Elerding,* 504 F.Supp. 606, 608 (C.D.Cal.1980). Although courts have held that an ERISA "plan" may exist

even in cases where it benefits only a single employee, *see Biggers v. Wittek Indus.*, 4 F.3d 291, 297 (4th Cir.1993) (there is no known requirement that a plan must cover more than one employee to be covered by ERISA), parties who enter into an employment contract which contains an incidental provision to induce continued employment does not constitute a separate and specific retirement "plan" under ERISA. *Williams v. Wright*, 927 F.2d 1540 (11th Cir.1991). Consequently, where, as here, the severance benefits were merely incidental to an employment contract, ERISA does not apply. *Jervis*, 504 F.Supp. at 609.

Thus, as the proposed severance benefits do not require the implementation of an administrative scheme, and were merely incidental to an employment contract, Plaintiff's severance benefits do not constitute a "plan" within the ERISA framework.[2]

### B. New York State Contract Claims Regarding Severance Payments

Plaintiff argues, in the alternative, that under New York State law the Plaintiff is entitled to receive severance benefits pursuant to the agreements signed by the parties. For reasons more fully explained below, the Plaintiff is entitled to receive those severance benefits.

When deciding a summary judgment motion involving a contract action, summary judgment can only be granted if the terms of the contract are unambiguous. *Sayers v. Rochester Tele. Corp. Supp. Management Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993); *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir.1989); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 119 (2d Cir.1985). Whether a contract is unambiguous is a question of law. *Sayers*, 7 F.3d at 1094; *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (N.Y.1990).

The legal principles surrounding a claim for contract enforcement are well settled. "The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they chose to use.'" *Sayers*, 7 F.3d at 1094 (quoting *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Ordinarily, if parties to a contract memorialize their agreement in a clear and complete document, their writing should be enforced according to the agreed upon terms. *W.W.W. Assocs.*, 565 N.Y.S.2d at 443, 566 N.E.2d 639. Evidence outside the four corners of the document as to the terms intended, but unstated, or misstated, are inadmissible to add to or vary the contract. *See id.* Hence, the parties, absent fraud or other wrongful conduct, would be bound by the agreement's contents. *Da Silva v. Musso*, 53 N.Y.2d 543, 444 N.Y.S.2d 50, 54, 428 N.E.2d 382, 386 (N.Y.1981) (defendants objected to the enforcement of a particular agreement, however, their motion was denied because they had signed the agreement, and the protested clause was two clauses above their signature); *Dunkin' Donuts of Am., Inc. v. Liberatore*, 138 A.D.2d 559, 526 N.Y.S.2d 141, 143 (2d Dep't 1988) (Plaintiff had signed several documents, among them, a guarantee Plaintiff did not realize she signed. Because she signed it and had failed to read it, she was precluded from asserting fraudulent inducement.).

However, there is no question that a contract may be modified if the contract provides for its modification. In the present case, the Employment Agreement contained a modification clause which stated that "[n]o variation hereof shall be deemed valid unless in writing and signed by the parties hereto, and no discharge of the provisions hereof shall be deemed valid unless by full performance by the parties hereto or by a writing signed by the parties hereto." (Janover Decl., Ex. A, ¶ 15(d)). Hence, the Employment Agreement could be modified.

---

**2.** Assuming *arguendo* that Plaintiff's severance benefits did constitute a "plan" under ERISA, the statute could not be applied here since Plaintiff was never unemployed. Awarding severance benefits would, therefore, constitute an impermissible windfall under ERISA. *See Ackner v.*

*Lenox*, 782 F.Supp. 267, 269 (S.D.N.Y.1992) (employees who continue comparable work with the successor to a business should not have their salary supplemented with severance payments from the prior employer as that would bestow a windfall).

Here, the Extension Agreement validly and successfully modified the Employment Agreement[3] because both the Employment Agreement and the Extension Agreement were signed by the same parties—Plaintiff, Axmar and Bernan.[4]

The result of modifying the Employment Agreement by the Extension Agreement is that the clause in the Employment Agreement which required the Plaintiff to cease all work with Bernan in order to receive his severance pay was voided. The Extension Agreement states:

> "[y]ou and I have subsequently discussed the continuation of my services beyond the effective date of my resignation.... Please recognize that the continuation of my employment ... does not, in any way, revoke my resignation ... under the employment agreement dated June 24, 1987 or the severance benefits accrued thereunder and the additional benefits granted by AXMAR in our letter agreement dated December 29th, 1989 [ (the Severance Agreement) ]."

Hence, Plaintiff could continue to work for Bernan yet receive his severance pay, when he terminated his employment for Bernan.

The Extension Agreement referenced the Severance Agreement.[5] The next issue for the Court to determine is whether the terms of the Severance Agreement, which was not signed by Bernan, also modified the Employment Agreement. The Plaintiff argues that the Severance Agreement is referred to in the Extension Agreement, which was signed by all the proper parties. He argues that when the Agreements are looked at as a whole, it is clear that the Severance Agree-

ment was meant to modify the Employment Agreement. The Defendants argue that because Bernan did not sign the Severance Agreement, it did not properly modify the Employment Agreement and furthermore, they argue that the Severance Agreement was fraudulently induced.

It is not dispositive that the Employment Agreement requires modifications to be signed by all the parties, if the evidence, taken as a whole, shows that the modification was authentic, or if the agreement was otherwise ratified by the parties' conduct. *DFI Communications, Inc. v. Greenberg,* 41 N.Y.2d 602, 394 N.Y.S.2d 586, 589, 363 N.E.2d 312 (1977); *Karel v. Clark,* 129 A.D.2d 773, 514 N.Y.S.2d 766, 767 (2d Dep't 1987). It is clear that Bernan's subsequent signing of the Extension Agreement, which referenced the Severance Agreement, would qualify as the Severance Agreement being "otherwise ratified by [Bernan's] conduct."

Furthermore, a binding agreement may be assembled from more than one document,[6] even if all the documents are not signed by the party against whom enforcement is sought. *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 54–55, 110 N.E.2d 551 (1953) (signed and unsigned writings can be read together as long as they clearly refer to the same subject matter); *Nolfi Masonry Corp. v. Lasker–Goldman Corp.,* 160 A.D.2d 186, 553 N.Y.S.2d 156 (1st Dep't 1990). Looking at the three Agreements together, it is clear that they constitute an Agreement that increased Plaintiff's severance benefits and voided the requirement that receipt of those benefits was conditioned on discontinu-

---

**3.** Defendants do not address this, and instead focus on the validity of the Severance Agreement, arguing it is not enforceable. However, as discussed below, the Severance Agreement is referenced and therefore incorporated into the Extension Agreement, which was signed by all the parties.

**4.** The defense's contention that defendant Marcus did not understand the document is without merit. As long as a party signed the writing they are presumed to have read and understood it. *See Jakobson Shipyard, Inc. v. Aetna Cas. and Sur. Co.,* 775 F.Supp. 606 (S.D.N.Y.1991); *see also Da Silva,* 444 N.Y.S.2d at 54, 428 N.E.2d at 386; *Dunkin' Donuts,* 526 N.Y.S.2d at 143.

**5.** The Extension Agreement states that Plaintiff would be entitled to severance benefits accrued under the Employment Agreement "and the additional benefits granted by AXMAR in our letter agreement dated December 29, 1989."

**6.** Although the Employment Agreement has a merger clause this addresses any contracts or agreements made prior or concurrent to the signing of the Employment Agreement and not subsequent to the signing of the Employment Agreement.

ing employment with Bernan. Hence, Plaintiff is entitled to all the benefits set out in the Severance Agreement, as well.

### C. Defendant's Claim of the $180,000 Under the Future Service Agreement

The final issue is whether the Future Services Agreement is unenforceable, or are Defendants entitled to the $180,000 the Plaintiff collected pursuant to the Consulting Agreement. Defendants allege that the $180,000 was consideration for part of the sale of Bernan to Wilton, and that, under the Future Services Agreement, they were entitled to the $180,000, if the Plaintiff did not work for Axmar or earn the money consulting for Wilton. The Plaintiff argues that the Future Services Agreement is unenforceable because it was an agreement to agree.[7] For the reasons more fully discussed below, the Court finds that the Defendants are entitled to summary judgment on this question.

■ The Plaintiff is correct is arguing that agreements to agree are not enforceable. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 249, 417 N.E.2d 541 (1981). Agreements must be sufficiently definite to be enforceable; however, this does not translate into a requirement that agreements be explicit. For example, if a methodology for determining a term of the agreement is provided for in the agreement, then it is sufficiently definite. *See Joseph Martin,* 436 N.Y.S.2d at 249–50, 417 N.E.2d 541; *Bernstein v. Felske,* 143 A.D.2d 863, 533 N.Y.S.2d 538, 540 (2d Dep't 1988); *Four Seasons Hotels Ltd. v. Vinnik,* 127 A.D.2d 310, 515 N.Y.S.2d 1, 6 (1st Dep't 1987). Furthermore, if the parties' intentions are ascertainable and the agreement is definite regarding the material terms, it will be enforced. *Bernstein,* 533 N.Y.S.2d 538; *Four Seasons,* 515 N.Y.S.2d at 6 (definiteness is essential but only towards material terms); *J. Baranello & Sons v. Hausmann Indus.,* 571 F.Supp. 333 (E.D.N.Y.1983) (parties need not agree on every aspect of their bargain before enforceable contract is reached).

■ In the present case, the Future Services Agreement in terms of the $180,000 at issue herein, was sufficiently definite. It contained a sum, a time line of when the sum would be paid, and an alternative payout if the Plaintiff did not work for Axmar. Although the Plaintiff's duties and additional compensation were not specified in the Agreement, his duties were sufficiently definite, because the Plaintiff had already worked for the Defendants in Florida and knew what the job entailed. Furthermore, the majority of the Agreement entailed the disbursement of the $180,000 and was not meant to be a Employment Contract.

Hence, because the Agreement is enforceable, and because there is no evidence before the Court that Plaintiff ever worked for Axmar, the Defendants are entitled to the $180,000 the Plaintiff received from Wilton, minus any documented consulting services he provided to Wilton. Summary judgment will be granted with respect to the liability of Plaintiff to the Defendants.

Accordingly, for the reasons stated above the Plaintiff's Motion for Summary judgment for severance benefits is granted on Counts I, II and III of his Complaint, and the Defendants' Cross–Motion for Summary Judgment is granted on Counterclaims 1 and 2 of the Answer. Counts IV through VII of the Complaint are dismissed and Counterclaims 1, 2, and 8 of the Answer are dismissed.

The parties are directed to appear for a status conference on the remaining counterclaims on Friday, November 3, 1995, at 10:00 a.m., in Courtroom 24B.

SO ORDERED.

7. Plaintiff's argument that he was fraudulently induced into signing the Future Services Agreement is without merit. Because Plaintiff signed the agreement, he is presumed to have understood it, and he is therefore bound by its contents. *See Da Silva,* 444 N.Y.S.2d 50, 428 N.E.2d 382; *Dunkin' Donuts,* 526 N.Y.S.2d 141.