**Eugene A. BAY, Plaintiff–Appellant,**

v.

**TIMES MIRROR MAGAZINES, INC., Defendant–Appellee.**

**No. 1416, Docket 91–7089.**

United States Court of Appeals, Second Circuit.

Argued May 3, 1991.

Decided June 25, 1991.

Leonard N. Flamm (Norman Mednick, Jill Schwartz, New York City, of counsel), for plaintiff-appellant.

Stephen E. Tallent (M. Chinta Gaston, Gibson Dunn & Crutcher, New York City, of counsel), for defendant-appellee.

Before OAKES, Chief Judge, WINTER, Circuit Judge, and MUKASEY, District Judge.*

WINTER, Circuit Judge:

This age discrimination action, brought by a former employee of Times Mirror Magazines, Inc. ("Times Mirror"), has its genesis in Times Mirror's acquisition in 1987 of *Field & Stream* magazine from Diamandis Communications, Inc. ("Diamandis"). Appellant Eugene Bay alleges that, after purchasing the magazine, Times Mirror deliberately eliminated the magazine's most senior, highly compensated employees, including Bay. Following discovery, the district court entered summary judgment in favor of Times Mirror. We affirm on the ground that Bay cannot produce evidence upon which a trier of fact could reasonably find that the company's stated reasons for discharging him are pretextual.

## BACKGROUND

In 1975 Eugene Bay accepted a position as National Marketing Director for *Field & Stream* magazine, then owned by CBS Magazines, Inc. In 1979 he became Associate Publisher and, two years later, Vice President and Publisher. In 1986, Diamandis acquired CBS Magazines and the following year sold four of its magazines— *Yachting, Home Mechanix, Skiing* and *Field & Stream*—to Times Mirror. Times Mirror already owned four magazines, *Ski, Outdoor Life, Golf* and *Popular Science,* which, it was hoped, the Diamandis publications would complement and thus enhance Times Mirror's sales of advertising space. With regard to employees of the acquired magazines, Diamandis required that Times Mirror retain the staffs of each magazine at existing salaries and bonuses. However, the parties agreed that once those employees had been evaluated and a reor-

ganization was under way, some might be terminated. Diamandis agreed to reimburse Times Mirror for severance payments to the first six former Diamandis employees so terminated. Bay, then age 54, was among the group terminated. At the time of his termination he was earning a base salary of $150,000 and was eligible for an annual bonus of approximately $45,-000.

The events resulting in Bay's termination began with a restructuring carried out after Times Mirror acquired the Diamandis publications. Times Mirror organized the magazines into two groups based on factors such as reader demographics, advertising compatibility and circulation size. The first group consisted of *Yachting, Skiing, Ski* and *Golf.* The second group consisted of *Field & Stream, Home Mechanix, Outdoor Life* and *Popular Science.* The concept of the reorganization was that each group, by virtue of its combined readership and targeted audience, would attract more advertising revenue than the individual magazines standing alone.

The restructuring entailed the creation of two new positions of group publisher, each with responsibilities for one of the two groups. Responsibility for matters such as an individual magazine's circulation, finance, personnel, salaries and marketing was centralized at the group level. Advertising and editorial responsibilities were severed. The inevitable consequence of this restructuring was that the publishers of the Diamandis magazines, who had had substantial autonomy, suddenly found themselves with greatly diminished responsibility, authority and staff. Prior to the acquisition, Bay had been responsible for virtually all of *Field & Stream's* business affairs, and, assisted by more junior executives, was essentially on his own to "meet and if possible exceed the budgeted pretax number for the magazine." After the acquisition, he had real authority only over advertising. As Bay testified at his deposition, "for the brief period of time that I was at [Times Mirror], the publisher role

---

* The Hon. Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

meant primarily advertising responsibility." Moreover, he was for the first time required to report regularly to second-level executives, specifically, James Kopper, the Executive Vice President of Times Mirror. Once a group producer was named, moreover, the publisher of *Field & Stream* would be required to report to that person.

Bay chafed at the diminution of his responsibilities. Indeed, he expressed his dissatisfaction even before the acquisition in a meeting with Andrew Dempsey, the President of Times Mirror, and Kopper. Two days after this meeting Kopper wrote to Dempsey as follows:

> Gene Bay, Publisher, Field & Stream— Has been with the book for a long time. Knows property. Interesting that Diamandis took the time to discuss Bay before the meeting. I know Gene for years. Some concern. He ran his own operation with little control. He mentioned more than once that he wanted to buy Field & Stream and pressed, "Where do I fit? I have options." I think your invitation to have a private meeting will clarify what he is getting at, but he made it clear, in my opinion, that he wants to talk with you and that Field & Stream is different.

According to Kopper's affidavit, Dempsey later told Kopper that in two subsequent private meetings, Bay had stated to Dempsey that he would like to report directly to Dempsey, not Kopper. Dempsey denied the request, instructing Bay to report to Kopper until a group publisher had been selected. Immediately after the acquisition, however, Dempsey fell ill and thereafter played little role in the active management of Times Mirror. Although Dempsey has not submitted an affidavit setting forth the substance of his pre-closing conversations with Bay, the account in Kopper's affidavit that Bay did not want to report to Kopper cannot be seriously contested. When asked whether he objected to reporting to Kopper, Bay stated in his deposition:

> Not in the personal sense of the relationship. But in the sense that my responsibilities in terms of producing revenues for the magazines transcended just the

area of advertising, which was his sole responsibility, and in that sense, licensing, list rental, all these other avenues, revenue streams that I was responsible for were beyond the realm of Mr. Kopper's responsibilities as advertising, the chief advertising executive, if you will.

\* \* \* \* \* \*

> [I]n the context of what my responsibilities were at the magazine [under Diamandis] and in light of what Jim Kopper's responsibilities were at Times Mirror, I can understand reporting to him as far as advertising is concerned. But he had nothing to do as far as these other revenue streams that I was involved in.

Bay's reasons for not wanting to report to Kopper thus reflected his dissatisfaction with the downgrading of his responsibilities as publisher, which left him with responsibility only over advertising.

Kopper interviewed Bay, along with other candidates, for the position of group publisher. In their discussions, Bay told Kopper that the entire group publisher concept was a bad idea and would not work. In his deposition, Bay recalled the meeting as follows:

> A. ... I suggested to [Kopper] that he [was] better off not implementing [the group publisher] scenario.
> Q. Can you recall what you said to him about that kind of scenario?
> A. I think basically I indicated that it was generally inefficient, that it would create obstacles to his dialogue with the publishers and also create an extraordinary expense in relation to the—any increased revenue that that kind of a move would generate.

Bay's disagreement with the group publisher concept was of course consistent with his objection to reporting to Kopper and downgrading of the responsibilities of publishers.

Ten days later, when Bay and Kopper met again to discuss the new position, Bay still had not accepted the group publisher concept and, according to Kopper, had no specific ideas for making it work. Bay's deposition testimony confirms that he at no

time dropped his criticisms of the group publisher concept.

Times Mirror thereafter decided to select another executive as group publisher for *Field & Stream's* group and to discharge Bay from his position as publisher of *Field & Stream.* The group publisher position was given to a person who was 41 years old at a salary of $107,000 per year. Bay's former downgraded position as publisher of *Field & Stream* was filled by a 35–year old person at a salary of $85,000.

On May 5, 1988, Bay commenced the instant action, alleging that these decisions violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (1988), and were part of a deliberate effort to replace older, highly compensated employees with younger, less costly employees. Times Mirror replied that its decisions were based on Bay's resistance to the restructuring program and his stated dissatisfaction with reporting to Kopper. Times Mirror moved for summary judgment, which, following oral argument, was granted from the bench without opinion. This appeal followed.

## DISCUSSION

We apply the familiar standards applicable to review of a grant of summary judgment. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). However, where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. As we have explained, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Company,* 933 F.2d 187, 191 (2d Cir.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986)).

As we observed in *Binder,* the respective burdens of proof under the ADEA are the same as under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1988). *See, e.g., Taggart v. Time, Inc.,* 924 F.2d 43, 45–46 (2d Cir.1991); *Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 103 (2d Cir. 1989); *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40, 43 (2d Cir.1988). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Although an employer must answer a *prima facie* case with a "clear and reasonably specific" explanation of the challenged employment decision, *id.* at 258, 101 S.Ct. at 1096, "the burden of *persuasion* does *not* shift to the employer to show that its stated legitimate reason for the employment decision was the true reason." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 245, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989) (emphasis added); *see Binder, supra,* at 192 n. 1. The plaintiff may carry his burden "either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence," but it remains at all times the plaintiff's burden. *Burdine,* 450

U.S. at 256, 101 S.Ct. at 1095 (emphasis added).

■ Bay argues that the court below erred in granting summary judgment because the record contains substantial direct and indirect evidence of age discrimination. With respect to direct evidence, he cites an internal memorandum written by Herbert Schnall, chairman of Times Mirror and its acting president in Dempsey's absence, to Kopper. The memorandum states:

In connection with your memo on group publishers, I have a strong feeling about the Mass Group. If, Gene Bay is not your ultimate selection (and I'm not urging that he should be), then I think you have to concern yourself with whether or not he should remain as a publisher. His salary is well above all of our other publishers, and in fact, would be more than we might have to pay for a group publisher. This alone, makes it mandatory, in my opinion, that he either be appointed a group publisher, or failing that, be let go. But, in addition, we have all the other problems which have surfaced with Bay—namely, his desire to report directly to the president, his insistence that he be responsible for editorial and circulation, as well as sales, and in general, the way he has handled himself since the acquisition.

In short, my feeling is ... group publisher or goodbye.

The portion of this memorandum concerning salary, Bay contends, establishes that "high salary was a critical factor in the decision not to retain [Bay] for either of the two publishing positions" and that Times Mirror based its discharge decision on an illegitimate factor because appellant's high salary was "a direct function of his longevity, experience, seniority or periodic salary raises." Appellant's Br. at 10, 11–12. We disagree.

Schnall, who served as acting president of Times Mirror during Dempsey's illness, was mistaken when he wrote that Bay was the most highly paid publisher in the company. Because it was Kopper, not Schnall, who made the decision to terminate, Schnall's mistaken view of Bay's salary might be given little weight.

■ More importantly, there is nothing in the ADEA that prohibits an employer from making employment decisions that relate an employee's salary to contemporaneous market conditions and the responsibilities entailed in particular positions and concluding that a particular employee's salary is too high. To be sure, high salary and age may be related, but, so long as the employer's decisions view each employee individually on the merits, do not impose a general rule that has a disparate impact on older workers, see *Geller v. Markham*, 635 F.2d 1027 (2d Cir.1980), and are based solely on financial considerations, its actions are not barred by the ADEA.

Even if the portion of Schnall's memo regarding Bay's salary represented Times Mirror's actual reasons for terminating him, therefore, the reasons expressed in the memo are legitimate. The memo treats Bay on the merits, compares his salary with that of other publishers, with salaries in the market for publishers generally and with the responsibilities of the two available positions. Age was not a factor. Moreover, the record discloses that three publishers earning less than Bay were older than he. The only publisher earning more than Bay was younger. The Schnall memo is thus not evidence of unlawful age discrimination.

■ We also conclude that the specific reasons put forth by Times Mirror as causes for Bay's termination are legitimate and that Bay has offered no evidence demonstrating them to be pretextual. With regard to the group publisher position, Times Mirror was fully justified in concluding that Bay's stated objections to the group publisher concept were ample grounds for naming someone else to that position. Bay and Times Mirror obviously had different concepts about the role a group publisher might perform and Times Mirror thus had cause to be concerned as to whether those differences in viewpoint would affect Bay's performance in that job.

With regard to the downgraded publisher position, Bay argues that he was rejected for that job because he was "overqualified" and that our recent decisions in *Binder*, at 187 and *Taggart v. Time*, 924 F.2d 43 (2d ·Cir.1991) preclude entry of summary judgment against him. We disagree.

Neither decision forbids employers from declining to place employees in positions for which they are overqualified on the ground that overqualification may affect performance negatively. *Binder*, at 192–93. The problem addressed in those cases is that a conclusory statement that a person is overqualified may easily "serve as a mask for age discrimination." *Id.* In the instant matter, however, we have more than a conclusory statement that overqualification was the reason for not retaining Bay in a reduced position. Bay's deposition testimony itself established that he was dissatisfied in the downgraded position both because of his diminished responsibilities and the requirement that he report to Kopper. Dissatisfaction in a downgraded position is a legitimate reason for an employer to replace an employee with someone not distracted by such dissatisfaction. Moreover, the review that led to Bay's termination concerned all eight magazine publishers. Of those retained in the downgraded position, three were older than Bay—and arguably as overqualified as Bay. Bay has thus offered no evidence upon which a trier of fact could reasonably reject Times Mirror's position that it examined Bay individually on the merits and concluded that his evident dissatisfaction with the reorganization necessitated his termination. We therefore affirm.