**Terence BOYLE, Plaintiff,**

v.

**McCANN–ERICKSON, INC., Defendant.**

**No. 94 Civ. 0080 (DAB).**

United States District Court,
S.D. New York.

Jan. 3, 1997.

Teitelbaum, Hiller, Rodman, Paden & Hibsher, P.C., New York City (Miriam Rena Spiro, William Hibsher, of counsel), for Plaintiff.

Turchin & Hoffman, P.C., New York City (Morton J. Turchin, of counsel), for Defendant.

### MEMORANDUM AND ORDER

BATTS, District Judge.

Plaintiff brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging employment discrimination based on national origin, pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), and pursuant to Section 296 of the New York State Executive Law. Defendant now moves for summary judgment.

### I. BACKGROUND

Plaintiff was born on June 29, 1935, and is an American-born citizen. (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 2–3.)[1] Defendant McCann Erickson, Inc. is the advertising agency, (*Id.* ¶¶ 5), where Plaintiff began working in 1981, doing freelance work. (Pl.'s 3(g) Stmt. ¶ 6.)

When Plaintiff was hired he signed a "Confirmation of Employment and Salary Agreement" which stated, "THE EMPLOYMENT PERIOD TO BE AT WILL." (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 8.) When Plaintiff was hired he was a member of the International Team ("IT") and remained on the IT until December 1991, when he was transferred to McCann New York. (*Id.* ¶¶ 9.)

The IT had four people on its team in 1979, which increased to 25 by 1991. (*Id.* ¶¶ 10.) Its purpose was to assist the local offices with international accounts, specifically to service a Coca–Cola account to apply adver-

---

1. These citations are to both the Plaintiff's and the Defendant's Local Rule 3(g) Statements.

tisements to specific countries and their cultures. (*Id.* ¶¶ 11.) Most of Plaintiff's work was on the Coca–Cola account and he won awards for his work on Coca–Cola jingles. (*Id.* ¶¶ 13.)

Several people supervised Plaintiff during his time with the IT, including Marcio Moreira ("Moreira") who supervised Plaintiff from 1981 until approximately 1986. In 1988, Moreira became Vice Chairman Chief Creative Officer International and was still responsible for the IT and continued to supervise Plaintiff, although not directly. (*Id.* ¶¶ 14.) During his tenure, Moreira wrote three of the four formal evaluations of Plaintiff's work, Plaintiffs salary rose from $65,-000.00 to $115,000.00 in 1992, and Plaintiff received several bonuses which were tied to the company's profits. (*Id.* ¶¶ 15, 17–19.) However, Plaintiff was the only member of the IT who did not receive a bonus in 1991. (*Id.* ¶¶ 20.)

Sometime in the late 1980s Arnold Blum became the Creative Director of the IT. (*Id.* ¶¶ 22.) Plaintiff complained to Blum about his use of ageist comments. (*Id.* ¶¶ 23.) Although Blum never apologized, such comments were never made again by Blum. (*Id.*) Plaintiff's other supervisor called Plaintiff's work "old fashioned" and "not fresh." (*Id.* ¶¶ 26.) Plaintiff asserts that these comments were ageist and commenced sometime before 1989 continuing beyond 1990. (*Id.* ¶¶ 27.)

In February 1991, David Tutin, Geoff Nauss and Bob Nisbet were designated as co-creative directors of IT, (*Id.* ¶¶ 40), accordingly, IT was split into three groups, each group handling different clients or different aspects of Coca–Cola. (*Id.* ¶¶ 42.) Plaintiff felt, Tutin, who was born on March 27, 1952, in Britain, and who was Plaintiff's director, made ageist remarks and remarks regarding Plaintiff's national origin. (*Id.* ¶¶ 42, 46, 54.) Other people observed Tutin's behavior and supported Plaintiff's observations. (*Id.* ¶¶ 48.) Plaintiff was also unhappy with the nature of the work, in that it was not challenging enough for his capabilities.

(*Id.* ¶¶ 43, 47, 49.) He attributed this to the tense relationship between him and Tutin. (*Id.* ¶ 52.)

Plaintiff complained to Moreira, who told him to resolve the situation with Tutin. (*Id.* ¶¶ 63–64.) Plaintiff felt that Tutin had permission to be abusive to pressure him to quit before vesting in his pension plan. (*Id.* ¶¶ 56.)[2]

By the end of 1991, Coca–Cola shifted most of its account from the IT to McCann Erickson New York. (*Id.* ¶¶ 73–74.) At that time most of the IT members were transferred or quit. (*Id.* ¶¶ 76.) The creatives left on the IT included foreign nationals and one American. (*Id.*) Other Americans remaining on IT were members of production. (*Id.*) Plaintiff was transferred to McCann New York. (*Id.* ¶¶ 78–79). However, Plaintiff continued to feel that the lack of work or the work given to him did not match his capabilities. (*Id.* ¶¶ 80–81.) In January 1992, Plaintiff was assigned to a group headed by Paul Capelli, who Plaintiff claims made ageist comments. (*Id.* ¶¶ 81–82.) In April 1992, Plaintiff was assigned to Ken Domanski's group, at which time Plaintiff continued to get work which he felt was menial; he also continued to be the brunt of ageist comments. (*Id.* ¶¶ 84, 86, 89–95.) In November 1992, Domanski and the other creative directors were told to reduce their payroll, Domanski had to reduce his by $400,000.00 (*Id.* ¶¶ 102–03.) Domanski submitted four names, one of which was the Plaintiff's name. (*Id.* ¶¶ 104.) Plaintiff was terminated in December 1992, at the age of 57. (*Id.* ¶¶ 7, 109.)

## II.  DISCUSSION

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106

---

**2.**  Plaintiff's pension plan vested after five years, but he could not benefit from it unless he was on the team for ten years. (*Id.* ¶¶ 58.)

S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Corselli v. Coughlin,* 842 F.2d 23 (2d Cir. 1988). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *La-Fond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILCO,* 933 F.2d 187, 191 (2d Cir.1991); *see also Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991).

The Defendant has moved for summary judgment on all nine causes of action brought by the Plaintiff.

**A. Plaintiff's Claims for Age Discrimination: First, Second and Fifth Causes of Action**

Plaintiff claims he was discriminated against based on his age, in violation of the ADEA (Compl. ¶¶ 51–54), and the New York State Executive Law. (Compl. ¶¶ 67–70.) Plaintiff also seeks liquidated damages upon a finding that Defendant's acts were willful. (Compl. ¶¶ 55–57.)

3. In many instances, in order to cut costs associated with salary, employers terminate those employees with the highest salaries. As older employees tend to have higher salaries than younger employees, simply because they have been employed longer, they tend to be those who will be terminated to fulfill this employer's purpose.

4. The analysis under the New York State Human Rights Law is identical to the ADEA. *Mastrange-*

■ Pursuant to the ADEA, an employer may not discharge or otherwise discriminate against its employees on the basis of their age. 29 U.S.C. § 623(a)(1). However, an employer may discharge an employee for reasons other than age, that could be associated with age. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611, 113 S.Ct. 1701, 1706–07, 123 L.Ed.2d 338 (1993); *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 117 (2d Cir.1991). Thus, "it is incorrect to say that a decision based on years of service is necessarily 'age-biased,'" *Hazen Paper,* 507 U.S. at 611, 113 S.Ct. at 1707, or that a decision cannot be based on salary.[3] *Bay,* 936 F.2d at 117.

■ An employee alleging discrimination pursuant to the ADEA has the burden on proving that age was a determinative factor in the employment decision. The employee does not have to show it was the principal factor but that it was a "significant contributing factor," *Lowe v. Commack Union Free School Dist.,* 886 F.2d 1364 (2d Cir.1989), *cert. denied,* 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990), or a determinative factor considered by the employer in its decision to terminate the employee. *Hazen Paper,* 507 U.S. at 610, 113 S.Ct. at 1706.

■ In order to make out a prima facie case for age discrimination pursuant to the ADEA,[4] a Plaintiff must show that 1) he is in the protected age group; 2) he is qualified for the job; 3) he was discharged; and 4) the discharge occurred under circumstances giving rise to an inference of age discrimination. *Maresco v. Evans Chemetics,* 964 F.2d 106, 110 (2d Cir.1992); *Montana v. First Fed. S & L Ass'n,* 869 F.2d 100, 106 (2d Cir.1989). If the plaintiff satisfies this burden, the burden of production[5] shifts to the defendant to state a legitimate, nondiscriminatory reason for the discharge. If the defendant succeeds

*lo v. Kidder, Peabody & Co.,* 722 F.Supp. 1126, 1132 (S.D.N.Y.1989); *Ashker v. IBM Corp.,* 168 A.D.2d 724, 563 N.Y.S.2d 572, 573 (3d Dep't 1990); *Mayer v. Manton Cork Corp.,* 126 A.D.2d 526, 510 N.Y.S.2d 649 (2d Dep't 1987).

5. The burden of persuasion remains at all times with the plaintiff.

in meeting this burden, then the burden shifts back to the plaintiff to show that the employer's reason is a pretext. *Montana*, 869 F.2d at 105.

Plaintiff is a member of a protected class,[6] he was discharged, and for purposes of this motion, the parties seem to agree he was qualified.[7] The only issue for the Court is whether the circumstances surrounding the discharge give rise to an inference of age discrimination. The inference may be shown through direct, statistical or circumstantial evidence. *Montana*, 869 F.2d at 104; *Piasecki v. Daughters of Jacob Nursing Home, Inc.*, 808 F.Supp. 1136, 1140 (S.D.N.Y.1992).

Plaintiff claims, based on the statements made by, and the actions of, his various supervisors, the statistics of those who worked for the Defendant and their ages, and the belief that he was replaced by a younger worker, that he was discharged based on his age. Plaintiff cites the following incidents in support of his claim of age discrimination:

(1) Blum, who left the employ of the Defendant in 1990, at age 46, allegedly made the following comments to Plaintiff—"still functioning at your age," "how can you write rock and roll at your age," "can you believe this is the work of a man that is 50 and a grandfather," and "not so bad for a guy in his fifties." (Pl.'s 3(g) Stmt. at 37–38; Pl.'s Responsive 3(g) Stmt ¶ 42.) [8]

(2) Sometime in 1989 and 1990, Moreira called Plaintiff's work old-fashioned. (Pl.'s 3(g) Stmt. ¶ 45; Pl.'s Dep. 65–66.)

(3) Jones, who left the employ of the Defendant in 1991, said Plaintiff was "a pain in the ass and an old woman." (Pl.'s Responsive 3(g) Stmt. ¶ 21.) These statements were not made to Plaintiff but to Plaintiff's co-worker, Andrew Boncher.[9] In his deposition

Plaintiff states, "Jones was a very benevolent creative director, and he didn't in any way refer to my age." (Pl.'s Dep. at 102–03.)

(4) Beginning in 1991 Plaintiff claims he was continuously given lesser work which he considered to be a demotion. (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 49.)

(5) In February 1991, Plaintiff's supervisor, Tutin, made several statements Plaintiff considers to be evidence of age discrimination, including, "the only reason I have asked for you on my department is because I believe that old men are trainable. . . . You're style of writing is old-fashioned." Tutin criticized Plaintiff's writing as "passe," "below standards," and "poor." (Pl.'s 3(g) Stmt. ¶ 22.)

(6) After Plaintiff was transferred to McCann New York, he worked for Paul Capelli. Capelli made two comments that Plaintiff claims were ageist—"even Boyle is able to do something contemporary," and Plaintiff's work is "sort of out of date." (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 81–82.) However, Plaintiff did not complain about these comments and Capelli left soon thereafter. (*Id.* ¶¶ 83.)

(7) When Plaintiff was assigned to work on Ken Domanski's [10] team, in April 1992, he was subject to "intense" supervision, which he considered to be a sign of discrimination. (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 84, 86; Pl.'s Responsive 3(g) Stmt. ¶ 43.) He complained of lack of work, which he also considered to be an act of discrimination. (Pl.'s Responsive 3(g) Statement ¶ 44.) Plaintiff alleges the work Domanski did assign him was to failing or unprofitable accounts. (Pl.'s Mem. Law at 5.) On one occasion, Plaintiff's co-workers came to Domanski looking for assistance on a project. (*Id.* ¶ 45.) When Plaintiff volunteered, the co-worker stated, "we

---

6. The class consists of individuals who are at least 40 years of age. 28 U.S.C. § 631(a); *Montana*, 869 F.2d at 103.

7. Defendant does not argue in its papers that Plaintiff was unqualified.

8. Plaintiff complained to Blum about these statements. After his complaint Blum never made any of these statements again. (Pl.'s & Def.'s 3(g) Stmt. ¶¶ 23.) Blum had no contact with the

Plaintiff after Blum left the Defendant's employ. Accordingly, he was not involved in the decision to terminate Plaintiff.

9. Boncher states that Jones felt Plaintiff was a thorn in his side because Plaintiff did not like to do certain things, such as stay away from home for too long. (Boncher Dep. at 24–25.)

10. Domanski was 42 at the time.

want somebody younger to work on this brand." (*Id.* ¶¶ 46–48.) Domanski eventually assigned two people, other than the Plaintiff, one of whom was 48. (Pl.'s Mem.Law at 13.)

(8) Finally, Plaintiff alleges that Moreira sanctioned the treatment of Plaintiff by refusing to act on his complaints. On one occasion Plaintiff complained to Moreira about Tutin. Plaintiff did not complain about age discrimination but about Tutin's abuse. (Pl.'s Dep. at 158–59.) Moreira cut Plaintiff off and said he had to work it out with Tutin.

Taking these allegations together and at face value, they constitute the final element necessary for a prima facie case.[11] However, the Defendant has advanced a legitimate non-discriminatory reason for Plaintiff's discharge. Sometime before Plaintiff was terminated, Domanski had divided his team into the A and B groups. There were six names on the B list, 3 of which were employees under the age of forty. (Turchin Aff. Ex. G; Def.'s Mem.Law at 23–24.) Domanski was then called on to reduce his payroll by $400,-000.00 by letting those employees go who would not affect Defendant's ability to service clients. (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 102–03.) Reductions thereafter occurred in November and December 1992. Five of those, including the three under 40 and the Plaintiff, on the B list left the employ of the Defendant. In 1993, Domingo Perez, age 37, was hired and assigned to the team and a 53-year-old was transferred to the team. (Domanski Dep. at 142.) The Court finds the Defendant has advanced a nondiscriminatory reason for Plaintiff's termination.

■ Once a defendant has advanced a nondiscriminatory reason for the discharge, the plaintiff must show that the reason is a pretext "either directly by persuading the court that a discriminatory intent more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Piasecki,* 808 F.Supp. at 1140–41 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). If the Plaintiff is unable to provide

direct evidence of age discrimination, then the inference may be shown through statistical or circumstantial evidence. *Fisher v. Vassar College,* 70 F.3d 1420, 1450 (2d Cir. 1995); *Montana,* 869 F.2d at 104; *Piasecki,* 808 F.Supp. at 1140. Plaintiff must "produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not the employee's age was the real reason for the discharge." *Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994). The evidence Plaintiff advances has already been laid out above.

■ Although ageist statements are an indication used to support a plaintiff's prima facie case that the discharge was based on age, *Piasecki,* 808 F.Supp. at 1141, they do not establish, on their own, direct evidence. Therefore, while they may be sufficient for a court to infer discrimination, they are not sufficient to satisfy Plaintiff's ultimate burden. *Fisher v. Vassar College,* 852 F.Supp. 1193, 1231 n. 25 (S.D.N.Y.1994), *aff'd,* 70 F.3d 1420, 1450–51 (2d Cir.1995).

Furthermore, the allegedly ageist statements made, must be scrutinized—are they ageist statements or statements indicating something connected to age but not discriminatory. *Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984) (calling employees "old ladies with balls" or "young turks" are not relevant to whether one was discriminated against on account of his age); *Fisher,* 852 F.Supp. at 1231 n. 25 (statements indicating one is "not up to speed" in techniques in the field are not direct evidence); *Getschmann v. James River Paper Co.,* 822 F.Supp. 75, 78 (D.Conn.1993), *aff'd,* 7 F.3d 221 (2d Cir.1993) (supervisor's comments—"it is sometimes difficult to teach a dog new tricks," and plaintiff is "set in his ways" were not sufficient to meet plaintiff's burden); *Fisher v. Asheville–Buncombe Tech. Community College,* 857 F.Supp. 465, 469 (W.D.N.C.1993), *aff'd,* 25 F.3d 1039 (4th Cir.1994) (calling someone's work "outdated" found not to be discriminatory.)

---

11. The Plaintiff must come forward with more than the Plaintiff's age. *Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 225 (E.D.N.Y. 1993).

Many of the statements Plaintiff alleges were discriminatory indeed are not. The statements made by Jones and Moreira are not discriminatory. *See Haskell,* 743 F.2d at 120; *Fisher,* 857 F.Supp. at 469; *Fisher,* 852 F.Supp. at 1231 n. 25. Nor are those made by Capelli. *See Fisher,* 852 F.Supp. at 1231 n. 25; *Getschmann,* 822 F.Supp. at 78. Tutin's comments were not directed at Plaintiff's age but at the quality of his writing.[12] There is nothing to indicate that Tutin found Plaintiff's work to be unsatisfactory only because he was older than Tutin.

■ Furthermore, most of the statements were made by those not involved in the discriminatory discharge.[13] *Fisher,* 852 F.Supp. at 1231 n. 25; *Getschmann,* 822 F.Supp. at 78. Blum, Jones, Capelli and Tutin were not involved in the decision to terminate Plaintiff. None of them were even at McCann New York with the Plaintiff at the time of his termination. There is no connection between their comments, even if found to be ageist, and the resulting discrimination—the termination. Accordingly, Plaintiff cannot rely on their comments as proof of age discrimination. *See, e.g., Corcoran v. GAB Business Servs., Inc.,* 723 F.Supp. 966 (S.D.N.Y.1989).

Plaintiff claims that the statements made by supervisors who did not have a decision in his discharge, although they cannot be used regarding the discriminatory firing, can be used to show a hostile corporate attitude. (Pl.'s Mem.Law at 9.) Plaintiff does not claim he is asserting a constructive discharge cause of action (Pl.'s Mem.Law at 10 n. 3), however he argues that the various supervisors' statements show a hostile corporate attitude that would be admissible to show age discrimination. Plaintiff cites to two cases—*Malarkey v. Texaco, Inc.,* 983 F.2d 1204 (2d Cir.1993); *Chase v. J. Walter Thompson Co.,* No. 89 Civ. 7989, 1992 WL 30934, at *4 (S.D.N.Y. Feb. 13, 1992)—one which is a case of retaliatory failure to promote and one of discriminatory firing. In one case the plaintiff continued to work for the defendant during the time the discriminatory acts occurred. Here, the discriminatory act is the termination. Plaintiff was not forced to quit because of the treatment he received, he was fired. Accordingly, Plaintiff's circumstances do not come under a hostile corporate claim. *Chase* considered the comments of people who were in the "chain of command" and held that statements by those who had a role in the discriminatory decision can be considered. However, the Court fails to see how a supervisor's comments, who had no contact with the Plaintiff at the time of termination, show a discriminatory reason for termination. Although Plaintiff attempts to cure this by suggesting that Moreira knew about the age discrimination and did nothing, this contention is unsupported. Moreira did not know about Blum's comments because, as Plaintiff testified, once Plaintiff told Blum, he ceased making any comments to Plaintiff. Plaintiff testified Jones never made any comments. In addition, Plaintiff never complained to Moreira about any comments he had made and Plaintiff told Moreira that Tutin was abusive, not that he was ageist. Finally, Plaintiff told Moreira that Domanski was not giving him legitimate work, diminished his responsibilities, passed him up for a promotion, and put him under the strict supervision of a younger team member.[14] There is no mention however, that Plaintiff indicated to Moreira he believed the reason for this treatment was due to his age.

■ Plaintiff also feels he was given lesser responsibilities at different times in his career with Defendant. However, this is not evidence of discrimination. In fact, the dissatisfaction expressed by the Plaintiff can be cause for termination. "[Plaintiff's] deposition testimony itself established that he was dissatisfied in the downgraded position both

---

**12.** Furthermore, Tutin was generally rude to employees, (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 48), lending support to the argument that he was simply rude and not ageist. *Spence v. Maryland Cas. Co.,* 995 F.2d 1147 (2d Cir.1993).

**13.** Plaintiff has not alleged constructive discharge where a plaintiff resigns because of the intolerable working conditions. In that case, evidence of the employee's treatment, whether made by a supervisor with authority to terminate, is relevant.

**14.** To support these contentions Plaintiff cites to an Affidavit he prepared for this motion.

because of his diminished responsibilities and [who he had to] report to.... Dissatisfaction in a downgraded position is a legitimate reason for an employer to replace an employee with someone not distracted by such dissatisfaction." *Bay*, 936 F.2d at 118.

Although being replaced with a younger employee lends itself to an inference of age discrimination, *Montana*, 869 F.2d at 105; *Piasecki*, 808 F.Supp. at 1141, Plaintiff has not shown that he was replaced with a younger employee. Plaintiff states his position was Vice President, Associate Creative Director. (Pl.'s Responsive 3(g) Stmt. ¶ 51.) In January 1993, Domingo Perez, age 37, was hired as Vice President, Associate Creative Director.[15] (*Id.* ¶ 52.) Defendant states that Perez was an art director and Plaintiff a copywriter. Hence, they had different skills and one could not replace the other. (Def.'s Mem.Law at 24.) Plaintiff does not offer any evidence to rebut this. Therefore, although Perez was younger than Plaintiff, it has not been shown that he replaced Plaintiff.

Hiring of new employees can also be used to infer age discrimination. *Montana*, 869 F.2d at 105. Plaintiff claims before the reductions occurred Domanski hired two people in their thirties and terminated three people over forty. (Pl.'s Responsive 3(g) Stmt. ¶ 49.) Plaintiff does not provide documents to support the statistics on hiring. As to the firings, Defendant states that the three people over forty were terminated because the client they worked for, General Motors, left Defendant.[16] (Domanski Dep. at 146.) Plaintiff has not offered any evidence to the contrary. Furthermore, Plaintiff does not explain how he calculated who was and was not counted in the statistics advanced. Even a cursory look at the employees fired who were copywriters or creatives shows more people under 40 who were "released" or otherwise terminated, than stated by Plaintiff. In the document cited by Plaintiff, his position is listed as "ACD" and the rea-

son for termination is "released." (Pl.'s Aff. Ex. 15.) In 1992, at about the same time Plaintiff was terminated, there were 2 employees under 40 who were "ACD" and "released." One other "ACD" employee, under 40, was terminated for "staff reductions." There were two employees over 40, including Plaintiff, who were "ACD" and were "released." The other two employees over 40, cited by the Plaintiff, were "SRVPACD," and were terminated for "loss of business." Accordingly, these statistics do not show any discrimination by the Defendant.

Plaintiff attempts to show discrimination by grouping employees into those who represented the Defendant to its clients on a regular basis and those who did not. (*Id.* ¶¶ 54–56.) He concludes that the number of people over 40 who had contact with clients decreased over the years.

1990 — 83 out of 166, 50%

1993[sic] — 69 out of 146, 47%

1993 — 42 out of 146, 29%

However, the Plaintiff does not indicate how he determined these figures. For example, how did the Plaintiff conclude who interacted with clients and who did not. Plaintiff does not give any indication of who was counted in the totals. Accordingly, the Court cannot rely on these statistics to conclude discrimination abounded. In fact, the statistics agreed upon by the Defendant and the Plaintiff, support the exact opposite conclusion.

In November 1992, Domanski and the other creative directors were told to reduce their payroll. (Pl.'s & Def.'s 3(g) Stmts. ¶¶ 102.) Domanski submitted four names (*Id.* ¶¶ 106), 2 of which were over age 50. The criteria he used to determine whose name would be on the list was "the least likely to succeed," least likely to "damage any client relationships," and least likely to damage the group financially. (*Id.* ¶¶ 106.) In November and December of 1992, forty-

---

**15.** In fact, the "A" and "B" list memorandum indicates that Domingo Perez was already being considered by Domanski. Turchin Aff. Ex. G.

**16.** It is apparent that the job market for those who held positions similar to Plaintiff was constantly in flux. They often were assigned to one account, for example, Coca–Cola or General Mo-

tors. If that company withdrew their account from the advertising agency then the employee assigned to the account would often be let go. This occurred to the Plaintiff himself prior to his employment with the Defendant. *See* Pl.'s & Def.'s 3(g) Stmts. ¶¶ 4(C).

seven employees either left or lost their jobs at the Defendant. (*Id.* ¶¶ 111.) Fifteen of those, like the Plaintiff, were "creatives." Of the fifteen, seven were over 40 years of age; and of the seven over 40, six were over 45. (*Id.*) Of the creative people employed by the Defendant, 57 out of 150 were over 40 years old in 1990; 54 out of 125 were over 40 years old in 1991; 55 out of 121 were over 40 years old in 1992; and 49 out of 107 were 40 years or older in 1993. (*Id.* ¶¶ 113.) These statistics correspond to the following percentages:

    1990:  38%
    1991:  43.2%
    1992:  45.5%
    1993:  45.8%

Accordingly, although the total number of creatives dropped from 150 to 107, the number of those employees over 40 increased. This cuts against any inference of age discrimination. *See, e.g., Morser v. AT & T Info. Sys.*, 715 F.Supp. 516 (S.D.N.Y.1989). There are several other factors which cut against an inference of age discrimination:

Plaintiff was hired at the age of 46, (Pl.'s and Def.'s 3(g) Stmts ¶¶ 6), a fact which undercuts an inference of age discrimination. *Piasecki*, 808 F.Supp. at 1141; *Suttell v. Manufacturers Hanover Trust Co.*, 793 F.Supp. 70, 74 (S.D.N.Y.1992). Plaintiff was fired with other people, both his age and younger than 40. *Montana*, 869 F.2d at 105. *Suttell*, 793 F.Supp. at 74. Furthermore, Plaintiff's salary increased from $65,000.00 to $115,000.00 during the time he was employed at Defendant. He received bonuses of between $5,000.00 and $14,000.00 every year he was employed at Defendant except the last two, and Moreira recommended a raise for the Plaintiff in 1989 although costs had to be cut. (*Id.* ¶¶ 33.) These facts cut against Plaintiff's claims.

Finally, Plaintiff alleges the Defendant's repeated refusals to promote him were an indication of discrimination. However, there has been no evidence advanced describing the positions Plaintiff applied for and whether he went through the normal procedures of applying for those positions and was turned down. In fact, Plaintiff testified at his deposition that he was happy with his job.

Taking these facts together, the Court finds the Plaintiff has not advanced evidence to show that Defendant's reason for termination was a pretext. Accordingly, Plaintiff's claims are dismissed.

**B. Plaintiff's Third and Seventh Causes of Action**

Plaintiff claims that "at the time of his termination, [he] and his counsel had complained, both orally and in writing, to the Chief Creative Officer of [the Defendant] about the unlawful employment practices committed by his supervisors on account of his age." (Compl. ¶ 59.) Plaintiff claims that his termination was in retaliation for these complaints in violation of 29 U.S.C. § 623(d) and New York Executive Law § 296(7).

To make a prima facie case of retaliation the Plaintiff must show that he was engaged in a protected activity; that the employer was aware of the activity; that the employee suffered adverse employment decisions; and that there was a connection between the adverse employment decision and the protected activity. *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988).[17] Proof of the causal connection can be shown by the proximity in time between the two factors. *Id.*

Plaintiff claims two acts of retaliation. First, Plaintiff states he learned, after his termination, that he was considered for freelance work but was turned down due to the filing of his case. (Moreira Dep. at 204.) However, this act does not constitute an adverse employment action. Such an action must impact on the employment or deprive the plaintiff of the ability to enforce his rights. *Penny v. Winthrop–Univ. Hosp.*, 883 F.Supp. 839, 845 (E.D.N.Y.1995). Here, Plaintiff had already been terminated; ac-

---

17. Stating a claim under New York State law is substantially similar to Title VII. *Pace Univ. v. New York City Comm'n on Human Rights*, 85 N.Y.2d 125, 623 N.Y.S.2d 765, 766, 647 N.E.2d 1273, 1274 (1995); *Electchester Housing Project, Inc. v. Rosa*, 225 A.D.2d 772, 639 N.Y.S.2d 848 (2d Dep't 1991) (citing *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991)).

cordingly this alleged decision did not effect his employment nor hinder him in any way from enforcing his rights.

█ Second, Plaintiff claims his termination was in retaliation for a November 13, 1992 letter sent to the Defendant from Plaintiff's attorney. The letter, sent to Moreira, informed him of the adverse job actions that had occurred concerning Plaintiff. The letter warned that any retaliation taken as a result of the letter was an independent violation of the law. Plaintiff was terminated on December 4, 1992. Accordingly, the Plaintiff has shown, at a minimum, three of the four factors. He was engaged in a protected activity, i.e. complaining of perceived discrimination; he suffered an adverse employment decision, i.e. he was fired; and the decision occurred very close in time to the protected activity, showing a causal connection. The only issue is whether the employer knew of the protected activity.

Defendant claims that the individual who made the decision to terminate the Plaintiff, Ken Domanski, did not know about the letter written by Plaintiff's counsel and in fact had made a decision to fire Plaintiff in September 1992, evidenced in a memorandum. (Turchin Aff.Ex. G.) Plaintiff argues that the September 1992 memorandum did not reflect an institutional decision to terminate Plaintiff,[18] and that in September 1992, "Domanski was already predisposed to acting against plaintiff because of his age." (Pl.'s Mem.Law at 24.) However, if Domanski wanted to fire Plaintiff because of his age, then he was not necessarily fired in retaliation for the letter.

Plaintiff attempts to argue that there is evidence that Domanski knew about the letter, as well as others who were involved in the decision to terminate Plaintiff. However, he cites to depositions not submitted and does not cite to his own deposition to support this argument. In fact, Plaintiff admits in his Local Rule 3(g) Statement that "[t]here is no evidence that Domanski had knowledge of any letter from Plaintiff's attorney until after this litigation was commenced." (Pl.'s 3(g) Stmt. ¶ 108.) In spite of this statement, Plaintiff argues that it is unbelievable that Moreira would not have discussed the letter with Domanski.

Assuming arguendo that Domanski knew about the letter, or that others who had input into a decision to terminate knew about the letter, then Plaintiff would have made out a prima facie case. However, the inquiry does not end there. If the plaintiff makes a prima facie case, the defendant must articulate a nondiscriminatory reason for its actions. *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). If defendant meets its burden then the plaintiff must come forward with evidence that the employer's reason is a pretext. *Id.*

Defendant states that the termination was the result of a reduction in the payroll. Plaintiff has failed to come forward with any evidence to show that this reason is a pretext for retaliation.[19] Accordingly, Plaintiff's third and seventh causes of action are dismissed.

## C. Discrimination Based on National Origin

█ In his fourth and sixth causes of action Plaintiff alleges he was discriminated against on the basis of his national origin, in violation of Title VII and the NYS Human Rights Law. In sum, Plaintiff claims that his "responsibilities were substantially diminished, his salary was frozen and his bonus was withheld for 1991 and 1992, and he was ultimately discharged in large measure because he was an American." (Compl. ¶¶ 63, 72.)

---

18. The memorandum list six people on the B-list. Then the memo states, "In order to upgrade the group as a whole, the plan is to move toward letting the people of the "B" list go, and hiring the following:." At which point there is a list of five names including the Plaintiff's name. Turchin Aff. Ex. G.

19. Plaintiff argues that although Domanski had to cut $400,000.00 from the payroll, this was a pretext because he hired other people before "downsizing" occurred. Plaintiff argues this point in the context of age discrimination and no arguments are forwarded supporting how downsizing was a pretext for retaliation. (Pl.'s Mem. Law at 14–15.) Even if the Court were to apply this argument to the retaliation claim as well, Plaintiff does not come forward with any additional evidence, other than that already discussed and rejected by the Court.

A plaintiff, in New York, has 300 days, from the time of the alleged discrimination, to file a charge with the EEOC. 42 U.S.C. § 2000e–5(e); *Butts v. City of N.Y. Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). If a plaintiff fails to file a timely charge with the EEOC, then his federal claim is time-barred. *Butts*, 990 F.2d at 1401 (citing *Gomes v. Avco Corp.*, 964 F.2d 1330, 1332–33 (2d Cir.1992)).

Defendant claims that after Plaintiff's transfer from the IT to McCann New York in January 1992, he makes no further allegations of national origin discrimination and therefore the 300–day time limit must be counted from January 1992. Plaintiff claims that the acts of *age* discrimination continued after his transfer and were ultimately used in the determination to fire him. Plaintiff states that he was forced out of the company because he was an American; and therefore his termination, having occurred within the time period, satisfied the burden of continuing violation. (*Id.* ¶¶ 12–13.)

The 300–day EEOC filing time limitation can be tolled by evidence of a "continuing violation," allowing a court to consider incidents occurring before the 300–day time limit as long as one act of discrimination occurred within the time limit. *Cornwell v. Robinson*, 23 F.3d 694, 703–04 (2d Cir.1994); *Burrell v. City Univ. of N.Y.*, 894 F.Supp. 750, 758 (S.D.N.Y.1995); *Carrasco v. New York City Off–Track Betting Corp.*, 858 F.Supp. 28, 31 (S.D.N.Y.1994), *aff'd*, 50 F.3d 3 (2d Cir.1995). "Under continuing violation doctrine, where the defendant has 'engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed in isolation. In such circumstances, if the charge has been filed no later than 300 days after the last act by the defendant pursuant to its policy, the plaintiff may recover for

earlier acts of discrimination as well.'" *Dukes v. Steinman, Boynton, Gronquist, & Birdsall*, No. 93 Civ. 7044, 1994 WL 406090, at *2 (S.D.N.Y. July 29, 1994) (quoting *Association Against Discrimination in Emp., Inc. v. City of Bridgeport*, 647 F.2d 256, 274 (2d Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982)).

To establish a continuing violation, a plaintiff must show that "specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell*, 23 F.3d at 704; *Burrell*, 894 F.Supp. at 759. Neither the effects of discriminatory acts, *Burrell*, 894 F.Supp. at 759 (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)), nor the discrete, unrelated acts of discrimination show a continuing violation. *Id.* (citing *Cornwell*, 23 F.3d at 704.) Furthermore, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory practice or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). Examples of what constitutes a discriminatory policy are discriminatory seniority lists or discriminatory employment tests. *Id.*

Plaintiff's national origin claim, however, does not fall into the continuing violation exception. "The continuing violation exception applies to cases involving *specific* discriminatory policies or mechanisms such as discriminatory lists, ... or discriminatory employment tests." *Carrasco*, 858 F.Supp. at 31 (quoting *Lambert*, 10 F.3d at 53) (emphasis in original). Plaintiff points to individual acts,[20] which on their own are not even

---

**20.** Plaintiff alleges that while on the IT, his supervisor Tutin made discriminatory comments about his American heritage and gave him "lesser" work because he was American. Plaintiff alleges when he complained to Moreira, a higher supervisor, Moreira was unresponsive. Plaintiff claims that when he was transferred to McCann New York in January 1992, all four, (there were five Americans—one remained on the IT, who was born in Massachusetts and grew up in Puerto Rico), Americans were transferred and put on

probation. (Pl.'s Responsive 3(g) Stmt. ¶¶ 9–10.) Plaintiff states that in 1990, Moreira promoted three less qualified colleagues over Plaintiff, none of whom were Americans. However, the only citation for this is Plaintiff's Affidavit. (To the extent that Plaintiff's Affidavit contradicts his deposition testimony it will be disregarded, *Vanguard Telecommunications, Inc. v. Southern New England Tel. Co.*, 722 F.Supp. 1166, 1170 n. 2 (D.N.J.1989), *aff'd*, 900 F.2d 645 (3d Cir.1990)). Plaintiff does not support his allegation that

necessarily discriminatory. In any case, individual acts of discrimination cannot come together to form a continuing violation. *Cornwell,* 23 F.3d at 695, 704; *Burrell,* 894 F.Supp. at 759. Plaintiff has failed to show, beyond conclusory statements, which are not sufficient to defeat a motion for summary judgment, that there was any type of policy of discrimination based on his national origin. Furthermore, after his transfer Plaintiff does not identify any acts to show that this alleged policy continued. (Pl.'s Dep. 125–26, 133–35, 154–56, 186–88, 191–95).

Plaintiff attempts in his Memorandum at Law (pp. 21–22), and in an accompanying affidavit to allege that Moreira, who was Brazilian at the time Plaintiff was hired, but became a citizen sometime thereafter, was the driving force behind his and others' discriminatory behavior towards Plaintiff. However, this allegation is unsupported. In fact, Plaintiff believed he was fired because he did not fill the "youthful profile." (Pl.'s Dep. at 293.) The deposition proceeded as follows:

Q. Did you believe [you were fired] because you were an American?

A. I believe I was under harassment by Dave Tutin because I was an American.

Q. And by anyone else?

A. By Dave Tutin....

those promoted were less qualified nor is there any discussion describing the surrounding circumstances of the promotions. In fact, the three colleagues who were promoted, including Tutin, were those who headed the three sub-groups of the IT, formed during a reorganization. Plaintiff stated he was not interested in such a promotion. (Pl.'s Dep. at 253.)

Furthermore, the Memorandum of Law alleges that the following facts support Plaintiff's allegation of discrimination: that Tutin told Plaintiff he was "too American," that all Americans were transferred to New York at the end of 1991, that all those who were kept on IT were international citizens, that in 1992 a foreign national was hired to start on the IT, and that budgetary reasons cannot explain the failure to give Plaintiff a bonus. Finally, Plaintiff states, "Arguably, at the time plaintiff ... [was] transferred to New York, Moreira had slated [him] for termination in part because [he was] American." There is no citation for these contentions, not even to Plaintiff's Affidavit. *Unsupported statements in a*

Q. Did anyone else harass you because you were American?

A. No.

*(Id.* at 293–94.)

Plaintiff was transferred in January 1992. He filed his complaint with the EEOC on February 4, 1993, more than 300 days after the last act of discrimination occurred. Hence, Plaintiff's claims of Title VII discrimination based on national origin and his claims pursuant to NYS Exec.Law § 296 [21] are hereby dismissed as untimely.[22]

### D. Eighth Cause of Action

Plaintiff brings a claim for intentional infliction of emotional distress. In his submitted Affidavit Plaintiff withdraws this claim. (Boyle Aff. ¶ 1.) It is hereby dismissed with prejudice.

### E. Ninth Cause of Action

In his ninth cause of action Plaintiff alleges breach of contract. Plaintiff contends that part of his compensation package was receipt of a bonus, which he received every year of his employment except the last two, 1991 and 1992. Plaintiff alleges he received no bonus in 1991, despite Moreira's promise that Plaintiff's bonus would not be affected by IT's dissolution.

Upon Plaintiff's start as an employee with Defendant he signed a "Confirmation of Em-

*memorandum of law are not sufficient to oppose a summary judgment motion.*

21. Under New York law Plaintiff has one-year from the discriminatory conduct to file a complaint. Plaintiff failed to do so. The same continuing violation analysis applies equally well to the state claim, and is equally unpersuasive.

Even if the claim was timely filed the Court would not retain jurisdiction of that sole state law claim. 28 U.S.C. § 1367.

22. Because the Court has dismissed Plaintiff's claims on procedural grounds it has not ruled on the substantive issues, mainly, whether an American, suing as an American, not as a Italian–American or an Argentinean–American, can sue for "reverse discrimination" against an American company (Answer ¶ 3), with supervisors who are foreigners, but who worked in the United States. *See, e.g., Lemnitzer v. Philippine Airlines, Inc.,* 816 F.Supp. 1441 (N.D.Cal.1992), *aff'd in part and reversed in part,* 52 F.3d 333 (9th Cir. 1995).

ployment and Salary Agreement." (Turchin Aff. Ex. B.) The start date listed in the agreement is June 11, 1981, with a salary of $65,000 and a statement in caps, "The employment period to be at will." The agreement was executed on June 30, 1981. The agreement states there is "no agreement or arrangement relating to the terms and conditions of your employment." (*Id.*) The agreement does not address or even mention a bonus.

Plaintiff first claims that an enforceable bonus compensation agreement can occur in the absence of a written agreement where the employee relies on the bonus or when there has been an inducement at the time of hiring or for continued employment. However, there is no allegation or proof submitted that at the time of hiring Plaintiff was induced by a promise of a bonus. Nor is this a case where a bonus was offered in exchange for a promise of continued employment. Even if the fact finder were to believe the Plaintiff that Moreira promised a bonus to Plaintiff, there is no allegation that the promise was made in exchange for continued employment.

Plaintiff cites to three cases to support his position. Two of the cases involve agreements providing for bonuses. The third case also involved an agreement at the commencement of employment and a promise to match an offer from another employer in order to induce the party to remain with the defendant in that case. Plaintiff has cited no case law to support his contention that receipt of bonuses created an implied promise to continue to pay bonuses. Finally, there is no evidence that anyone spoke about the 1992 bonus with the Plaintiff.

Furthermore, Defendant points to New York General Obligations Law § 5–1105 which states that if two parties have signed a writing indicating a promise based on past consideration then it is enforceable. Here, there is no allegation of any such writing, therefore, Moreira's alleged promise is not enforceable on that ground either. *Clark v. Bank of N.Y.*, 185 A.D.2d 138, 585 N.Y.S.2d 749 (1st Dep't 1992); *DeVito v. Pokoik*, 150 A.D.2d 331, 540 N.Y.S.2d 858 (2d Dep't 1989).

Plaintiff's ninth cause of action for breach of contract is dismissed.

## III. CONCLUSION

Defendant's Motion for Summary Judgment is GRANTED in its entirety. Plaintiff's Complaint is dismissed.

SO ORDERED.